UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RANDY MILLER and<br>CHAD MILLER,<br><br>Defendants. | **SEALED INDICTMENT**<br><br>25 Cr.<br><br>**25 CRIM    138** |

## COUNT ONE

**(Conspiracy to Commit Securities Fraud and Wire Fraud)**

The Grand Jury charges:

### Overview

1. From at least in or about November 2019 through at least in or about May 2023, RANDY MILLER and CHAD MILLER, the defendants, deceived investors and prospective investors in municipal bonds issued to finance the Legacy Park sports complex in Mesa, Arizona. RANDY MILLER and CHAD MILLER misrepresented the economic prospects and risks associated with Legacy Park to induce investors to purchase bonds they would not have purchased had they known the truth. The defendants' fraudulent conduct generated more than $280 million in proceeds before the project failed and collapsed into bankruptcy, leaving investors who purchased the bonds with near total losses.

2. RANDY MILLER and CHAD MILLER, the defendants, accomplished their fraudulent scheme through an array of lies, forged documents, and false financial projections. For example, RANDY MILLER, CHAD MILLER, and others working at their direction misrepresented the amount and extent of anticipated customer interest in Legacy Park by fabricating letters of intent and so-called "pre-contracts" that bore the names of persons and organizations that did not approve them, including youth sports programs and other sports-related

organizations. RANDY MILLER and CHAD MILLER used these forged documents to generate falsely inflated projected revenues for Legacy Park, which the defendants conveyed to prospective investors.

3.      By in or about August 2020, the initial bond offering closed and generated approximately $251 million in proceeds. RANDY MILLER and CHAD MILLER, the defendants, promptly converted at least hundreds of thousands of dollars of the bond proceeds to their personal use, such as a home, automobiles, and increased salaries. Moreover, in or about June 2021, RANDY MILLER and CHAD MILLER caused the issuance of a supplemental bond offering for Legacy Park, which generated an additional approximately $33 million based, in part, on many of the same false representations about Legacy Park's projected revenues that RANDY MILLER and CHAD MILLER had disseminated during the initial bond offering.

4.      Ultimately, Legacy Park did not earn the revenue that RANDY MILLER and CHAD MILLER, the defendants, had told prospective bond investors that it would. Indeed, Legacy Park failed to generate revenue sufficient to cover even one full bond payment. In or about October 2022, the defendants' company defaulted on the Legacy Park bonds and, in or about May 2023, declared bankruptcy. In the bankruptcy proceeding, bondholders recovered no more than $2.5 million out of the approximately $284 million owed on the Legacy Park bonds, amounting to pennies on the dollar.

### The Defendants Solicited Investments in Legacy Park Bonds

5.      In the early 2000s, RANDY MILLER, the defendant, began working on his proposal to build a youth sports park in the Phoenix, Arizona area. His son, CHAD MILLER, the defendant, joined the effort after CHAD MILLER's professional baseball career ended. In or around 2016, the defendants commissioned a feasibility study to determine whether a sports park

in the Phoenix area would be financially viable. But the study determined that the project would generate substantially lower revenues than the defendants anticipated. The study's authors told the defendants that if they wanted higher revenue projections validated by the feasibility study, they would need to substantiate those projections with letters of intent from would-be customers.

6.      Over the next several years RANDY MILLER and CHAD MILLER, the defendants, unsuccessfully sought financing for construction of the sports park. Then, in 2019, an investment bank agreed to assist the defendants in attempting to finance the construction of the sports park with municipal bonds. Municipal bonds are debt securities typically issued by a state, city, or county to raise money for public projects, like building schools, highways, or water systems. Some municipal bonds—including those relevant here—are backed exclusively by revenue, meaning interest payments and principal payments to bondholders are backed only by income generated from the project. In 2020, with the assistance of the investment bank, the defendants offered revenue-backed municipal bonds, issued through the Arizona Industrial Development Authority, for the construction of a sports park in Mesa, Arizona called Legacy Park. The bonds were backed by the expected future revenues and assets of Legacy Park, which was anticipated to open in or about 2022.

7.      As part of their solicitation of investments in the Legacy Park bonds, in or around June 2020, RANDY MILLER and CHAD MILLER, the defendants, and others acting at their direction, issued a preliminary limited offering memorandum, which purported to disclose all material facts, circumstances, and risks related to the Legacy Park project and the bonds. In the offering memorandum, the defendants repeatedly touted that Legacy Park already had received written "pre-contracts"—which purported to be "binding" commitments from organizations "indicating their commitment to use" Legacy Park and sign formal contracts within 90 days of the

3

park's groundbreaking—as well as "letters of intent"—which where purportedly signed by organizations that had "confirmed their commitment to use Legacy Sports Park" and would sign pre-contracts "after construction ground-breaking." The offering memorandum listed by name over 50 organizations, including several major sports organizations, from which the defendants had purportedly received letters of intent and pre-contracts. In the offering memorandum, RANDY MILLER and CHAD MILLER touted the importance of these written commitments from customers as creating an expectation of "100% occupancy prior to breaking ground, providing a revenue base upon the commencement of operations." The offering memorandum projected that, based substantially on these commitments, Legacy Park would generate approximately $96.3 million in revenue in its first year of operations, sufficient to cover the bond payments, and characterized the level of commitment from customers as Legacy Park's "key differentiator to comparable facilities." The offering memorandum and its attachments were electronically transmitted to prospective investors, including investors located in the Southern District of New York.

8.  RANDY MILLER and CHAD MILLER, the defendants, also included in the offering memorandum two independent feasibility studies that purported to validate the financial viability of the Legacy Park project. The offering memorandum represented that one study evaluated the feasibility of the proposed Legacy Park project in Mesa, reviewed the pre-contracts and letters of intent, concluded that Legacy Park would meet its bond payment obligations and have a positive net operating income in its first year of operations, and considered additional revenue sources proposed by the defendants and "affirmed" its "prior findings regarding feasibility of the increased revenue to be generated." Included with the study were financial projections prepared by CHAD MILLER and others in or about 2019, which purported to add additional

4

revenue and revised gate and parking fees to the study's estimates for a total projected revenue of approximately $90.1 million in Legacy Park's first year of operations. In a second study appended to the offering memorandum, an independent feasibility consultant purported to opine on the feasibility of Legacy Park based on a "peer review" of the first feasibility study and a review of the letters of intent provided by the defendants. That study concluded that the Legacy Park would generate approximately $84.5 million in year one revenue.

9.  After publishing the offering memorandum, RANDY MILLER and CHAD MILLER, the defendants, took steps to promote the sale of the Legacy Park bonds to prospective investors. On or about July 8, 2020, the defendants offered a webinar presentation to potential bond investors. During the presentation, CHAD MILLER and other individuals acting in concert with the defendants presented a slide deck that touted the commitments from the over 50 organizations that had signed letters of intent and pre-contracts as ensuring that Legacy Park would be "at or near 100% occupancy on day one of opening." CHAD MILLER also claimed that the various leagues' commitments supported Legacy Park's projected revenue, which CHAD MILLER claimed would be sufficient to make the required payments on the Legacy Park bonds. Specifically, CHAD MILLER told investors that Legacy Park anticipated generating approximately $23 million in direct revenue in its first year of operations from 25 organizations that had purportedly signed pre-contracts and approximately $18.9 million from 26 organizations that had purportedly signed letters of intent. Based on these commitments and the resulting revenue, including indirect revenue from concession sales, parking fees, and entrance fees, the defendants represented to investors that they would be able to repay interest and principal on the park's bonds even if Legacy Park underperformed its revenue projections by approximately 60%.

10.     RANDY MILLER and CHAD MILLER, the defendants, also provided letters of intent, pre-contracts, a financial pro forma spreadsheet, and other supporting documents to investors. The defendants populated a virtual data room created for potential investors to download materials supporting the bond offering, including the letters of intent and pre-contracts. For example, the data room included a pre-contract with an Arizona youth soccer organization, purportedly signed by the league's owner on June 16, 2020, which stated that the soccer league agreed to rent dozens of fields and stadiums at Legacy Park for over 30 tournaments and 20 league days per year, for a 10-year period. As another example, the data room included a pre-contract and a letter of intent from the Arizona affiliate of an organization that hosts sporting events for children and adults with intellectual disabilities, that were purportedly signed by the organization's CEO on June 15, 2020. The pre-contract agreed to reserve 8 fields, 8 courts, and the main stadium to accommodate 5,000 participants per event for two three-day events, for a 10-year period. Similarly, the data room included a pre-contract and a letter of intent from an athletic performance coaching business that were purportedly signed by its founder on June 19, 2020. The pre-contract stated that the performance company would relocate its entire business to Legacy Park and give Legacy Park all of its revenue. A further example of materials in the data room is a letter of intent from a volleyball consultant that was purportedly signed by its president on or about August 2, 2019. That letter stated that a volleyball club would relocate its operations to Legacy Park. The data room containing these materials was made available to investors located in the Southern District of New York.

11.     The pre-contracts and letters of intent, among others, were modeled in the defendants' pro forma, a spreadsheet that CHAD MILLER, the defendant, and others prepared and made available to investors in the data room and summarized in the offering memorandum. The

pro forma included a tab for each organization from which the defendants purportedly had procured a letter of intent or pre-contract, and then modeled the direct revenue—rental fees and participant registration fees—Legacy Park expected to receive from that organization based on the anticipated number of events, teams, fields, and spectators each event would generate. For instance, based on the soccer organization's purported pre-contract, the defendants calculated that during Legacy Park's first year of operations it would expect to make approximately $5.76 million in direct revenue, which was the single largest source of anticipated direct revenue from the park's prospective customers. Similarly, the defendants' pro forma attributed approximately $417,000 in year one expected direct revenue from the organization hosting sporting events for athletes with intellectual disabilities; approximately $1.85 million in year one expected direct revenue from the performance coaching business; and approximately $369,000 in year one expected direct revenue from the volleyball club.

12.     On or about August 20, 2020, the initial Legacy Park bond offering closed after raising approximately $251 million in the public bond markets through the sale of bonds. In or about March 2021, RANDY MILLER and CHAD MILLER, the defendants, caused the issuance of a supplemental bond offering, which was purportedly made due "to the substantial demand for rental space at the Legacy Sports Facility." Prospective investors in the supplemental bond offering were provided the initial offering memorandum and a supplement. On or about June 16, 2021, the supplemental bond offering closed, raising an additional approximately $33 million. The proceeds generated by the sale of the bonds in the initial and supplemental offerings were intended to finance the construction of Legacy Park, including paying construction costs and disclosed salaries.

## The Defendants Defrauded Investors in the Legacy Park Bonds

*The Defendants Generated Fake and Forged Records Regarding Interest in Legacy Park*

13.     RANDY MILLER and CHAD MILLER, the defendants, presented to investors in the Legacy Park offering memorandum, investor presentation, and data room false and misleading statements about the park's anticipated customers, its projected revenue, and its financial feasibility.

14.     Of the approximately 50 organizations that RANDY MILLER and CHAD MILLER, the defendants, presented as having signed letters of intent or pre-contracts related to Legacy Park, more than half did not sign the documents the defendants said they did. Repeatedly, RANDY MILLER, CHAD MILLER, and those working for them, altered authentic letters to inflate the anticipated users, fees, or the organization's commitment to the project, or to change dates to make the letters appear to have been issued recently instead of the years-old dates on the originals. On still other occasions, the defendants, and those working for them, simply created fake documents, such as the vast majority of the pre-contracts, from scratch.

15.     For example, the pre-contract with an Arizona youth soccer organization featured in the data room had not been signed by the league's owner, as the contract purported to reflect. Rather, CHAD MILLER, the defendant, had created the document by directing an associate to alter a prior letter from the organization to make the document appear to be a valuable pre-contract. The letter of intent and pre-contract from the organization hosting sporting events for disabled athletes had not been signed by the organization's CEO, as those documents purported to reflect, and the forged documents vastly overstated the participant attendance and total headcount for events held by the organization. The pre-contract from the performance coaching business, purportedly reflecting an agreement to relocate the entire business to Legacy Park and give Legacy

Park all of its revenue, was a complete forgery. The founder of the performance coaching business did not sign the pre-contract and had not had discussions about potentially moving the business to Legacy Park until after the pre-contract was purportedly signed. A letter of intent purportedly from that same business was a materially altered version of a prior letter from the business's founder, and the alterations had the effect of making it appear that the performance coaching company had generated more revenue and offered bigger classes than, in fact, it did. The letter of intent from a volleyball consultant about a volleyball club was also fake. The consulting company's president had not signed the letter and, contrary to the assertions of the letter, did not agree to relocate the business's operations to Legacy Park. Indeed, in or about 2016, the company's president told RANDY MILLER, the defendant, that the volleyball club did not intend to use Legacy Park or be part of the project.

16. In or about May 2020, the investment bank working on the Legacy Park bond offering reminded RANDY MILLER and CHAD MILLER, the defendants, that the letters of intent needed to include "consent to assignment" language that, in sum and substance, stated that the organizations that had signed the letters of intent agreed to assign rights of the defendants' business—called Legacy Sports—to Legacy Cares, a non-profit entity that the defendants had set up to be the formal borrower for the Legacy Park bonds. Over the next approximately two weeks, RANDY MILLER, CHAD MILLER, and others working at their direction created forged documents from the letter of intent signatories purporting to assign the letters of intent from Legacy Sports to Legacy Cares. To do so, CHAD MILLER directed others, including a consultant working with him, to copy signatures from the letters of intent to the forged assignment letters. For example:

    a. On or about June 3, 2020, CHAD MILLER emailed a construction consultant working on the Legacy Park project ("Co-Conspirator-1"), "here are a few more

Consent to Assign forms that need your 'special touch'. lol. All of these forms have original signatures from their LOI's, its just very hard to decipher on these forms." Co-Conspirator-1 replied with consent to assign forms that had been modified to look legitimate.

        b.      On or about June 4, 2020, CHAD MILLER texted Co-Conspirator-1, "Just finished uploading all of the consent to assign forms in the Dropbox…. You, [Lawyer-1], Randy [MILLER], and myself need to read each one of these, compare them to the spelling in the LOIs, just to ensure no names are misspelled. Also look at the dates and fonts on each set [of] forms. Don't want to get in trouble just because we didn't do a quality control review lol."

        c.      Later that evening, CHAD MILLER emailed RANDY MILLER: "the full set [of] consent letters. Will you please do one last review of all the forms to ensure that everything is accurate. I have also attached a dropbox link below so you can reference spelling for each form back to the LOI. [Co-Conspirator-1] and I have already gone through it twice, we just [need] to ensure quality control. No name spelling can be off. Once we all sign off on the package, I will fwd it off to [the investment bank]."

    17.    In addition, on or about June 1, 2020, the investment bank asked CHAD MILLER and RANDY MILLER, the defendants, to obtain an assignment from the firm that conducted the 2016 feasibility study that stated that the defendants' non-profit entity could use the study. At the defendants' direction, their attorney contacted the feasibility consulting firm, asking for a signed assignment. But the feasibility consulting firm had several questions about the assignment and did not provide a signature. So RANDY MILLER instructed CHAD MILLER to be prepared to forge the assignment from the feasibility consulting firm. Specifically, on or about June 3, 2020, RANDY MILLER emailed CHAD MILLER just the scanned signature page of an agreement that had previously been signed by a partner at the feasibility consulting firm and wrote, "Looks like

your signature. LOL If needed."

18.   On or about June 15, 2020, shortly after the investment bank asked CHAD MILLER, the defendant, if letter of intent signers would sign pre-contracts instead, CHAD MILLER directed Legacy Sports' chief operating officer ("Co-Conspirator-2") to forge signatures on the pre-contracts, writing, "If there's one that you know is in, but we can't get a hold of them, then we can do what we did with the consent to assignment forms, if necessary."

*The Defendants Conveyed False and Misleading Information About Legacy Park to Prospective Investors*

19.   RANDY MILLER and CHAD MILLER, the defendants, and their associates used the fabricated and altered pre-contracts and letters of intent to present to investors higher anticipated revenues for Legacy Park than they knew could be supported by the true circumstances.

20.   RANDY MILLER and CHAD MILLER, the defendants, and others working at their direction, including Co-Conspirator-1 and Co-Conspirator-2, based the revenue figures in the bond offering memorandum, the data room's pro forma spreadsheet, and aspects of investor presentations on the forged pre-contracts and letters of intent. Because many of the input values were fictitious, including that any revenue from certain organizations—such as the soccer league, the disabled athletes organization, and others—was expected at all, the bond offering memorandum and pro forma spreadsheet substantially overstated projected future revenue and included revenue that the defendants knew they would not receive. As a result, investors who read the offering memorandum, received the investor presentations, and accessed the data room received materially false and misleading financial data.

21.   In addition to the forged and altered letters of intent and pre-contracts, RANDY MILLER and CHAD MILLER, the defendants, also misrepresented the results of the two independent analyses that the defendants had appended to the offering memorandum and

highlighted in various investor materials. For example, contrary to the claims made in the initial offering memoranda, the first featured analysis had not examined the Mesa, Arizona proposal, but rather a different potential site; the consultant who prepared the analysis never reviewed the pre-contracts; the analysis had not been completed in September 2017 but rather August 2016; and the consultant never "affirm[ed] its prior findings" regarding Legacy Park's feasibility based on new revenue sources after the study was completed in 2016. Moreover, the defendants omitted from the description of the first analysis various disclaimers and negative comments. These misrepresentations, in turn undermined the validity of the second analysis, which assumed that it could rely on the first study's conclusions, and, moreover, and that all of the letters of intent were legitimate.

22. Legacy Park's ability to generate revenue to repay the bonds and make interest and principal payments was important to investors. The inflated revenue projections conveyed to prospective investors through the data room, the offering memorandum, and investor presentations misled investors as to the economic benefits and risks of investing in the Legacy Park bonds and, in particular, deceived them as to the likelihood that the Legacy Park bonds would be repaid. As a result, the defendants' false and inflated revenue projections induced investors to purchase the Legacy Park bonds when they would not have done so.

*The Defendants Misappropriated Legacy Park Bond Proceeds*

23. In addition to marketing the bonds through false and misleading statements, RANDY MILLER and CHAD MILLER, the defendants, also used bond proceeds for personal expenses and luxuries, such as, (a) in or about February 2021, to purchase a Chevrolet Tahoe for a relative who worked for Legacy Sports; (b) in or about April 2021, to purchase a Cadillac Escalade registered to CHAD MILLER; (c) in or about July 2021, to use more than $400,000 in

12

bond proceeds to purchase a home for RANDY MILLER; (d) in or about 2021 and 2022, to take approximately $100,000 more each than the expected salaries they disclosed in the pro forma; and (e) by in or about June 2021, to withdraw hundreds of thousands of dollars separate from, and in addition to, their salaries.

24. In or about December 2021, after the chief financial officer of Legacy Sports confronted RANDY MILLER and CHAD MILLER, the defendants, with several of these transactions, RANDY MILLER and CHAD MILLER agreed to repay Legacy Sports approximately $1.89 million and $347,199, respectively.

### The Fraudulent Scheme Collapses

25. After Legacy Park opened in January 2022, the revenues and visitors promised by RANDY MILLER and CHAD MILLER, the defendants, failed to materialize. About eight months later, on or about August 1, 2022, Legacy Cares failed to make its first full monthly bond payment on the Legacy Park bonds. Legacy Cares again failed to pay on or about September 1, 2022 and October 3, 2022. By on or about May 1, 2023, Legacy Cares filed for bankruptcy protection. In the bankruptcy proceeding, Legacy Park was sold for less than approximately $26 million. Of those proceeds, no more than approximately $2.5 million went to repay the approximately $284 million owed to Legacy Park bondholders.

### STATUTORY ALLEGATIONS

26. From at least in or about November 2019 through at least in or about May 2023, in the Southern District of New York and elsewhere, RANDY MILLER and CHAD MILLER, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, to wit, (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and

13

78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

27. It was a part and an object of the conspiracy that RANDY MILLER and CHAD MILLER, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce, and of the mails and of a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

28. It was a further part and an object of the conspiracy that RANDY MILLER and CHAD MILLER, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

29. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about June 30, 2020, RANDY MILLER and CHAD MILLER, the defendants, caused an investment bank to print and distribute to prospective investors in New York, New York an initial offering memorandum containing multiple false and misleading statements regarding the risks and value of Legacy Park bonds.

    b. On or about July 8, 2020, CHAD MILLER participated in a live webinar that was viewed in New York, New York by prospective investors in the Legacy Park bonds.

    c. In or about July 2020, CHAD MILLER caused an investment bank to share false and forged pre-contracts and letters of intent with prospective investors, including investors located in New York, New York, through use of a digital data room.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

30. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

31. From at least in or about November 2019 through in or about May 2023, in the Southern District of New York and elsewhere, RANDY MILLER and CHAD MILLER, the defendants, willfully and knowingly, directly and indirectly, by the use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a

manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, RANDY MILLER and CHAD MILLER made false and misleading statements to prospective investors in the Legacy Park municipal bond offering about Legacy Park's anticipated customers, its projected revenue, its financial feasibility, and the use of bond sale proceeds.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

32.  The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

33.  From at least in or about November 2019 through in or about May 2023, in the Southern District of New York and elsewhere, RANDY MILLER and CHAD MILLER, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, RANDY MILLER and CHAD MILLER engaged in a scheme to obtain money from investors by means of false and misleading statements about Legacy

16

Park's anticipated customers, its projected revenue, its financial feasibility, and the use of bond sale proceeds, and in furtherance of that scheme used interstate wires, some of which transited to, from, or through the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Aggravated Identity Theft)

The Grand Jury further charges:

34. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

35. From at least in or about November 2019 through at least in or about May 2023, in the Southern District of New York and elsewhere, RANDY MILLER and CHAD MILLER, the defendants, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, RANDY MILLER and CHAD MILLER used the names of purported future customers of Legacy Park during and in relation to the wire fraud violations charged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## FORFEITURE ALLEGATIONS

36. As a result of committing one or more of the offenses charged in Counts One, Two, and Three of this Indictment, RANDY MILLER and CHAD MILLER, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of

money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Substitute Assets Provision

37.    If any of the above-described forfeitable property, as a result of any act or omission by the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

_____  
GRAND JURY FOREPERSON

_____  
MATTHEW PODOLSKY  
Acting United States Attorney