UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHAD MILLER,<br><br>Defendant. | No. 1:25-cr-00138-LAK-2<br><br>Judge Lewis A. Kaplan |

## **SENTENCING MEMORANDUM OF CHAD MILLER**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 2

FACTUAL BACKGROUND .................................................................................................. 3

   I.   MR. MILLER'S PERSONAL BACKGROUND. ........................................................ 3

   II.   LEGACY SPORTS. ...................................................................................................... 4

   III.   LEGACY SPORTS AND MR. MILLER. .................................................................. 5

      A.   Mesa Site/ Legacy Park. .................................................................................... 5

      B.   Ziegler. .............................................................................................................. 6

      C.   Financing and Construction. ............................................................................ 10

      D.   Legacy Park Opening, OVG Failures, and Emergency Financing. .............. 11

      E.   Legacy Park Bankruptcy. ................................................................................ 13

   IV.   MR. MILLER'S INDICTMENT, GUILTY PLEA, AND ACCEPTANCE OF
RESPONSIBILITY .................................................................................................... 14

AN EVALUATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) ..................... 16

   I.   18 U.S.C. § 3553(a): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE. . 17

      C.   Mr. Miller's Involvement Was Driven by Familial Relationship. ................ 20

      D.   Mr. Miller Was Only Tangentially Involved with the SFA Study. ............. 22

      E.   The PSR Does Not Capture OVG's Underperformance at the Park. .......... 22

      F.   Mr. Miller's Role in the Supplemental Bond Offering. ............................... 22

      G.   Mr. Miller's Forfeiture Amount Does Not Reflect his True Financial Gain. ............. 23

      H.   The Facts Surrounding this Matter do not Comprise the Typical White-Collar Case. . 23

   II.   18 U.S.C. § 3553(a): THE HISTORY AND CHARACTERISTICS OF THE
DEFENDANT. ........................................................................................................... 24

      A.   Mr. Miller Serves as the Primary Caretaker for his two Young Children. .................. 25

   III.   18 U.S.C. § 3553(a)(2). THE NEED FOR THE SENTENCE IMPOSED. .................. 26

      A.   Mr. Miller's Post-Offense Rehabilitation and Efforts to Begin a New Chapter in His
Life. 26

      B.   A Minimum Sentence Will Reflect the Seriousness of the Offense, Promote Respect
for the Law, and Provide Just Punishment for the Offense. .................................................. 28

      C.   A Minimum Sentence for Mr. Miller is an Adequate Deterrent and Also Protects
Public from Further Crimes. ................................................................................................. 29

CONCLUSION .................................................................................................................... 31

## PRELIMINARY STATEMENT

Mr. Miller has spent the past three years confronting the profound consequences of his involvement in the Legacy Sports bond offering. Legacy Park ("the Park") was never a typical construction project. It was Randy Miller's passion and "other child;" a vision he pursued for nearly thirty years. It was an ambitious project: a world-class, all-encompassing youth and adult sports complex that they hoped would serve families, athletes, and the community for generations. In the early years, Randy Miller and his longtime colleague, Mike Baggett, scouted sites throughout Arizona, before eventually settling on Mesa, as the site for Legacy Park. Along the way, Randy Miller collected dozens of Letters of Intent ("LOIs") from sports organizations, demonstrating market interest in the project long before investors ever came into the picture. These LOIs were unenforceable, but they symbolized the genuine enthusiasm Randy Miller had cultivated over decades of planning for a sports complex.

From the outset, financing to create the Park proved to be a constant struggle. By the time Ziegler Investment Bank ("Ziegler") came on the scene in late 2019, Legacy Sports had endured years of failed attempts to finance the Park. When Ziegler expressed confidence that a municipal bond offering could bring the project over the finish line, Randy and Mr. Miller believed they had finally found the partner who could make their dream a reality. However, Ziegler placed relentless pressure on them to quickly produce LOIs and financing related materials in support of the bond offering. Under this pressure, Mr. Miller made serious mistakes. He amended LOIs, updated dates, and signed consents to assignments without consent from the sports organizations, believing that because these were unenforceable or background documents, amending them caused no harm. He convinced himself that the organizations, many of which had longstanding ties to Legacy Sports through Randy Miller and other Legacy Sports executives, would surely remain interested.

The project's collapse arose from systemic and unforeseeable issues: massive construction overruns, repeated delays, operating lines and loans that never materialized, the lingering effects of COVID-19, and Oak View Group's ("OVG") failure to perform its operational obligations. OVG projected two-thirds of the projected revenue categories (sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise) and delivered only a fraction of what had been promised. Jon Willis Ltr. (Ex. 1); OVG Operating Agreement (Ex. 2 at 23–25); OVG Ltr. (Ex. 3).

The Court should recognize the broader context: Mr. Miller's role in this case was not that of an executive seeking to wrongfully line his pockets, but that of a son swept up in furthering his father's dream of an unprecedented and overambitious project.

## FACTUAL BACKGROUND

## I.    MR. MILLER'S PERSONAL BACKGROUND.

Mr. Miller was born in the mid-1980's in Phoenix, Arizona, the eldest son of Randy and Paige Miller. Presentence Report ("PSR") ¶ 98.[1] Mr. Miller and his younger brother, Brett, lived with both parents until their divorce when Mr. Miller was approximately twelve (12) years old. PSR ¶¶ 100–101. After the divorce, Mr. Miller moved with his father. PSR ¶ 101. Mr. Miller's childhood and relationship with his father was marked by conditions that instilled in him a deep need for paternal approval and a pattern of deferring to authority figures often at the expense of his own judgment. Mr. Miller's relationship with his father has largely been a complicated story with chapters filled with a son's failing attempts to secure his father's love and footnotes detailing emotional neglect. Mr. Miller Ltr. (Ex. 17 at 1–2; filed under seal).

---

[1] As of the filing of this sentencing memorandum, the PSR has not yet been finalized.

## II. LEGACY SPORTS.

From the beginning, Legacy Sports USA, LLC ("Legacy Sports"), was Randy Miller's passion project; a fixation he pursued for nearly thirty years. Mr. Miller grew up watching his father chase his dream of building a large-scale multi-purpose sports complex in Arizona. As a boy, he saw the project in the background of his daily life; as a young adult, he began to understand how central it had become to his father's identity.

Over the decades, Randy Miller scouted multiple locations in Arizona: Glendale, North Phoenix, and tribal lands around the Phoenix metro area. He searched for large tracts of contiguous land that could be leased because Legacy Sports lacked the funding/funding to purchase land outright. At the same time, Randy Miller courted sports organizations, collecting dozens of Letters of Intent ("LOIs"), from sports organizations who might use his sports complex, with the hopes of someday proving that his dream was viable. These LOIs were not enforceable contracts but preliminary commitments; documents where leagues, clubs, or associations who expressed an interest in using fields or facilities if the Park ever came to fruition. Randy Miller, and others, amassed these LOIs over several years *before* the Mesa site became official and long before Ziegler entered the picture.

By 2016, Randy Miller and his longtime colleague and attorney, Mike Baggett, recognized that investors would demand more than LOIs to commit capital. They commissioned Sports Facilities Advisors ("SFA") to prepare a feasibility study for a sports complex project referred to as "Victory Lane Park," located in North Phoenix, Arizona ("SFA study"). The costly study underscored the ambition and viability of the project, but ultimately Victory Lane Park never materialized. Undeterred, Randy Miller and Mike Baggett continued their search for a suitable site for the sports complex.

Throughout this early period, Mr. Miller remained on the periphery, watching his father devote nearly every ounce of energy to this dream. Watching his father's dream never materialize and seeing him suffer repeated rejection in his business pursuits left an indelible mark on Mr. Miller that, when coupled with their fractured relationship, led him to do whatever he could to support Legacy Park. Caused him to place the legacy park above

## III. LEGACY SPORTS AND MR. MILLER.

### A. *Mesa Site/Legacy Park.*

Randy Miller's ambitions for a large-scale youth sports complex drew Mr. Miller in, not out of personal ambition, but from loyalty and a desire to win his father's approval by helping him with his life-long project, along with a desire to support what he believed was a community-centered initiative. At first, his contributions were modest. He helped with community outreach and operational logistics, using his personable nature to build relationships with local youth sports organizations. As the project expanded, Randy Miller urged that Mr. Miller take more of a leadership role, assigning him: investor presentations, marketing responsibilities, and eventually the title of Chief Executive Officer ("CEO"). PSR ¶¶ 122–123. From 2017 until Legacy Park's bankruptcy in 2023, Mr. Miller served as an executive with Legacy Sports. PSR ¶¶ 65, 122–123.

Despite Mr. Miller's title of CEO,  he relied on others to assist with and monitor strategic decisions; particularly those related to financing and investor relations in connection with the Park Mr. Miller lacked training in executive level management, commercial construction, municipal bond offerings, and employee leadership of an organization of that level, but he accepted these responsibilities. Mr. Miller's role, in addition to assisting with financing efforts, was also largely the public-facing: marketing the Park's vision, fostering community partnerships, and presenting operational plans prepared by others. PSR ¶ 123; *see* Jon Willis Ltr. (Ex. 1).

### B. *Ziegler.*

Randy Miller spent decades searching for a suitable site and collecting LOIs, while also pursuing financing for Legacy Park through several unsuccessful attempts. Those failures underscored the need for an experienced financier. Sometime between August and October 2019, Legacy Sports was introduced to Ziegler through a third party. Ziegler is a specialty investment bank that focuses on municipal finance and structured finance; its work is concentrated in sectors that rely heavily on long-term capital projects and bond financing. PSR ¶20; Ziegler Investor Update (Ex. 4 at 16).

Legacy Sports recognized that only an experienced underwriter with access to institutional investors could transform Randy Miller's vision into a viable financing package and they relied on Ziegler's expertise to identify the optimal financing structure for the Park. Ultimately, Ziegler recommended municipal bonds as the best source of financing for the Park, but informed Legacy Sports that it could not serve as the bond borrower. Instead, Ziegler proposed the use of a nonprofit borrower and a decision was made to appoint Legacy Cares (an entity formed by Randy Miller in 2017 or 2018) as the borrower of the municipal bond offering.

In January 2020, Legacy Sports executed its official engagement with Ziegler, moving the Legacy Park project beyond the mere planning stages. Ziegler Engagement Agreement (Ex. 5). Ziegler informed Legacy Sports that a municipal bond offering required a Limited Offering Memorandum ("LOM") and a feasibility study to demonstrate the Park's viability to investors. Legacy Sports only had the prior 2016 SFA study from the Victory Lane Park concept. However, Legacy had severed ties with SFA years prior and lacked funds to commission a new study. Instead, Ziegler chose to hire Johnson Consulting to conduct a peer review of the outdated SFA

study. Legacy Sports understood that Ziegler would use Johnson Consulting's review, as the primary basis for investor disclosures.

Ziegler also took the lead in drafting the LOM and coordinating with Legacy Sports, sports organizations, and potential investors. In January 2020, Ziegler was fully managing and guiding Legacy Sports in connection with the municipal bond offering. Ziegler began drafting the LOM using the previously provided LOIs and outdated SFA study. During this process, Ziegler told Legacy Sports that the existing LOIs (many of them outdated and vague) were inadequate to show clear and measurable interest in Legacy Park. Specifically, Ziegler requested more robust LOIs that spelled out specific details such as the number of teams or participants, the duration and frequency of events, projected attendance, and estimated financial commitments. Ziegler insisted that without these details, investors would not view the LOIs as credible evidence of demand, and directed Legacy Sports to provide this information immediately.

At this time, Randy Miller and Mr. Miller, and others, intent on securing financing for the Park, recognized that reissuing dozens of LOIs would take months and delay the bond process, so they discussed their options amongst their executive team. They relied other Legacy Sports' executives, whose long-standing relationships with local and national sports organizations, combined with extensive knowledge of operating sports leagues and events, positioned them to address Ziegler's demands. *See* Jon Willis Ltr. (Ex. 1). On information, Jeff De Laveaga[2] suggested to Legacy Sports that they did not need to obtain entirely new LOIs for every organization. Many of the organizations were long-term sports contacts of Jeff De Laveaga, and others, and their authorization would be unnecessary given this history.

---

[2] Jeff De Laveaga was brought on as CRO/ COO specifically for his extensive experience in operational strategy, revenue modeling, and coordinating financial metrics for large-scale ventures. His duties included assisting Legacy Sports in capturing credible financial projections and performance indicators necessary to support the financing process and instill investor confidence.

Ziegler continued to insist that Legacy Sports provide the revised LOIs immediately to keep the financing on track. Randy and Mr. Miller, desperate not to lose their best opportunity to secure financing after decades of failed financing attempts, began revising and amending the remaining LOIs. Randy and Mr. Miller wrongfully justified the amendments to these documents because they already possessed the LOIs and believed the organizations remained committed to the park project. It was also clear to Legacy Sports that these LOIs were unenforceable documents, a point that was ultimately disclosed in the LOM. *See* LOM Excerpts (Ex. 6 at 49–51). Additionally, Jeff De Laveaga, and others, implicitly confirmed the validity of the amendments to the LOIs when these more seasoned employees acquiesced to this conduct; providing dates, tournaments, and expected attendance in the amended LOIs.

Mr. Miller personally amended several LOIs without obtaining explicit reauthorization from the organizations; actions he knew were improper without the knowledge or approval of the organizations. He drafted a few LOIs outright, including one for the Fiesta Bowl,[3] based only on preliminary conversations and his belief that the organizers would ultimately support Legacy Park. In doing so, Mr. Miller substituted his own judgment for theirs and wrongly assumed their full commitment; an error he now recognizes as a serious lapse in his judgment.

By early 2020, Legacy Sports managed to produce the amended LOIs that Ziegler requested in connection with the LOM. In April 2020, Ziegler now requested that Legacy Sports assign those LOIs to Legacy Cares, the nonprofit conduit borrower of the bond proceeds. With financing in the balance, and in the middle of the COVID pandemic when they could not easily revisit every sports organization the Legacy Sports executive team transposed the existing LOI signatures onto the corresponding assignment forms and submitted them to Ziegler.

---

[3] Mr. Miller is a member of the Fiesta Bowl committee.

As part of its underwriting due diligence, Ziegler required Legacy Sports to prepare detailed financial pro formas for inclusion in the LOM. These pro formas served as financial projections, showing anticipated revenues from tournaments, league play, and other events, and were meant to demonstrate to investors that Legacy Park could generate sufficient income to service the bonds. OVG separately provided projected revenue figures for its assigned operational categories (representing 60%+ of the overall Park revenue) and park operating expenses.[4] *See* OVG Operating Agreement (Ex. 2 at 23–25). This included sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise which were incorporated into the overall financial model. Developing the financial projections fell outside Mr. Miller's expertise, but he compiled them with input from others at Legacy Sports. Each tab listed organizations, dates, and projected attendance, which Mr. Miller did not independently validate, but were based on limited research and historical data obtained from other similar sports complex projects. He deferred to other Legacy Sports' executives, who confirmed to him that these practices were acceptable given the existing relationships between Legacy Sports and the several sports organizations. PSR ¶¶ 27–30.

By August 2020, Ziegler finalized and issued the LOM. It included the revised LOIs, the pro formas, and excerpts from the 2016 SFA feasibility study. Only then did Legacy Sports learn that Ziegler had inserted in the LOM indication that SFA had been retained for the 2020 bond offering; *Mr. Miller was aware that the SFA study was intended to be referenced in the LOM, however, not that SFA was actively engaged to review the 2020 bond*. Ziegler required Legacy to secure Oak View Group ("OVG") as a partner. *See* Bryant Barber Email (Ex. 7 at 1, 3). OVG's reputation in sports management carried significant weight with investors, and Ziegler emphasized

---

[4] Notably, OVG operated the Park at approximately "three times the projected operating costs they had originally presented to bond investors prior to funding." *See* Jon Willis Ltr. (Ex. 1).

that OVG's involvement was essential to completing the bond offering specifically because the Millers lacked prior experience in operating a sports complex of this magnitude. *Id.* Under the agreement, OVG assumed responsibility for a majority of the Park's revenue categories, including sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise. *See* OVG Operating Agreement (Ex. 2 at 23–25). Those categories accounted for roughly two-thirds of the $96.3 million in projected revenues. Legacy Sports, by contrast, per the LOM, limited their projected revenues to only those related to sports programming. OVG also pledged to invest $10 million directly into the Park and its commitments formed a cornerstone of the financing structure for Legacy Park. Ziegler Investor Update (Ex. 4 at 6, 8). While, Mr. Miller agreed to defer fees owed to him after the bond offering closed as a means to control expenses.

### C. *Financing and Construction.*

On August 19, 2020, Legacy secured financing and bond proceeds began to be released for construction and other operational expenses. Construction funds went into a Legacy Cares-controlled bank account, and Legacy began receiving a monthly allowance for pre-opening costs. Legacy Sports understood that the first bond payment was due in September 2022, which left less than two years to complete construction, open the Park, and generate enough revenue to cover the bond payments.

Waltz Construction, a local general contractor, guaranteed to build Legacy Park for $180 million and committed to advancing the upfront costs for permitting, easements, zoning, architectural work, civil engineering, and subcontractors; expenses that Legacy Sports had no ability to cover on its own. Waltz Construction was selected specifically because it offered to shoulder those costs. Legacy Sports was told the Park construction would proceed under a single-phase Guaranteed Maximum Price ("GMP"). This meant that the entire Park would be built in one

continuous phase, with a fixed maximum price that Waltz Construction could not exceed. For Legacy Sports and potential investors, a single-phase GMP carried enormous significance: it signaled cost certainty, reduced risk of ballooning expenses, and ensured that every major revenue-generating component of the Park would open together and on time.

On September 20, 2020, Legacy Park broke ground and almost immediately, new issues surfaced. Legacy Sports discovered that (1) the Park construction costs had been mispriced by over $100 million; (2) although investors had been told the Park would be built under a single-phase Guaranteed Maximum Price ("GMP"), Ziegler unilaterally changed the cost arrangements to a three-phase GMP just before closing,[5] without notifying investors; and (3) the initial contractor, on information, submitted fraudulent invoices and ran over budget, all which contributed to roughly $40 million in mechanic's liens. Legacy Sports promptly notified Legacy Cares, the construction monitor, and Ziegler about these issues.

### D. *Legacy Park Opening, OVG Failures, and Emergency Financing.*

In January 2022, Legacy Park opened but construction remained incomplete; the performance training facility, Fieldhouse C, and critical infrastructure were still awaiting construction, while the e-sports arena and twelve soccer fields were never built. These facilities had been projected to serve as major revenue generators. COVID's lingering financial effects further suppressed revenue, leaving the Park without the early revenue surge it needed. *See* Cancelled and Postponed Events (Ex. 8).

---

[5] The shift from a single-phase GMP to a three-phase GMP materially altered both the scope and risk of the project. A single-phase GMP would have locked in a fixed, all-inclusive price for the entire project and required the contractor to deliver all facilities within that cap, providing cost certainty and ensuring that all major revenue-generating components open together. By contrast, a three-phase GMP spreads construction across multiple phases, increasing the risk of cost escalation, construction delays, and partial delivery of the project.

OVG was underperforming from day one. OVG never delivered the $10 million investment it had promised and did not provide the operational oversight and management it was contractually obligated to perform. *See* Ziegler Investor Update (Ex. 4 at 6, 8); *see* Douglas Moss Email (Ex. 9). OVG's anticipated support was central to investor confidence and Legacy's financial model. Bryant Barber Email (Ex. 7 at 1, 3). Although, OVG initially hired 30 staff before the Park's opening, that limited hiring effort merely underscored its broader failure to live up to its obligations. While the sports side of the Park consistently brought in participants after it opened, it was severely understaffed.

Neither the $10 million investment from OVG, nor the promised $25 million operating line from Ziegler, ever materialized. Those funds were earmarked for essential expenses: land lease payments, utilities, employee payroll, insurance, and daily operating costs. Without these operating lines, and while still managing construction delays and cost overruns, Legacy Sports faced a looming September 2022 bond payment with no reliable source of operating capital.

From 2022–2023, Legacy Park welcomed more than four million visitors, ranking as Arizona's second most-visited attraction after the Grand Canyon. *See* Placer.ai Report (Ex. 10). Despite exceeding attendance expectations and generating between $18–$21 million in sports operations and $5 million in sports sponsorships (roughly 40 percent of the projected $41 million in sports-side revenue), Legacy Sports could not overcome OVG's failure to perform essential Park operations. *See* Jon Willis Ltr. (Ex. 1). In total, Legacy Park generated approximately $31–33 million in year one (with OVG who was responsible for two-thirds of the Park's projected $96.3 million in annual revenue only generating $7–8 million of this figure).

The Park's revenue, hamstrung by OVG's operational failures, quickly collapsed into crisis. Subcontractors filed mechanic's liens for unpaid bills, and Legacy Sports did not have the

funding to meet payroll. Mr. Miller was often scrambling to simply keep the Park afloat.[6] He deferred management and accounting fees and cut his own salary to ensure employees were paid for their work at the Park. Instead of demanding the previously deferred bond fees, Mr. Miller reinvested his own personal funds back into the Park to support Park operations. UMB Bank Statement (Ex. 16; filed under seal)

In mid-2022, facing mounting debt and the inability to meet financial obligations, Legacy Sports began seeking alternative financing. Mr. Miller had previously sold a portion of his equity in Legacy Sports USA to Michael Kuntz, a businessman who partnered with Legacy Sports. Mr. Miller received $4.8 million from that transaction, but per a written agreement, he immediately returned $3.25 million to Kuntz in an effort to secure much needed financing for the Park. National Sports Opportunity Partners, LLC ("NSOP") Loan Agreement (Ex. 11). The explicit understanding was that Kuntz would use those funds to secure a larger business loan (for his own entity NSOP and, from the proceeds, release $15 million to Legacy Park for operational expenses. This infusion of capital never materialized and the $3.25 million was never returned to Mr. Miller. Instead of securing the promised capital, Legacy Sports was left with mounting debt and no relief. This transaction has since been characterized as personal profit, but the reality is that Mr. Miller sacrificed his equity in Legacy Sports in an attempt to keep the Park operational.

### E.  *Legacy Park Bankruptcy.*

Following the Kuntz loan failure, Mr. Miller, seeking to avoid default and/or bankruptcy, pivoted and sought refinancing through Loop Capital. Loop Capital Engagement Ltr. (Ex. 12). On

---

[6] Legacy Sports was due a development fee upon closing of the 2020 bond offering. Instead, the Millers/ Legacy Sports agreed to forgo required payment, and defer all fees until the Park achieved stabilization and a debt coverage ratio after the first and second years of operations. Legacy Sports also never took its monthly accounting fee or management fee which were both permitted under the Qualified Management Agreement between Legacy Cares and Legacy Sports.

September 22, 2022, Legacy Sports formally retained LCM to serve as its "strategic advisor to provide investment banking services in connection with the Company's capital raising needs as it considers restructuring its current debt obligations." Loop Capital Engagement Ltr. (Ex. 12 at 1). The sports side of the Park continued to trend upward and Loop Capital expressed confidence in the Park project. Legacy Sports facilitated an agreement with Loop Capital in which Loop Capital offered to inject its own equity while covering the $40 million in mechanic's liens that crippled operations. Loop Capital's refinancing proposal would have absorbed the liens, restore construction progress, and restructure the full bond amount of $283 million. However, trustee counsel, refused to consider the Loop Capital refinancing. Consequently, Legacy Cares missed its first bond payment and defaulted on the municipal financing.

Bankruptcy soon followed and the Park ultimately sold for $25 million, with investors recovering $2 million and retaining a 20 percent equity stake. Despite the bankruptcy, the park is still operating, now under the name Arizona Athletic Grounds, and is a major sports attraction.[7]

## IV. MR. MILLER'S INDICTMENT, GUILTY PLEA, AND ACCEPTANCE OF RESPONSIBILITY.

On April 1, 2025, Mr. Miller was arrested at his home in Phoenix, Arizona, following the government's investigation into the fraudulent municipal bond offerings associated with Legacy Sports. PSR ¶ 71. His arrest came nearly two years after Legacy Sports filed for bankruptcy, a collapse the government alleges was based on the culmination of systemic misrepresentations perpetuated by Mr. Miller and other Legacy Sports' executives who shepherded the financial aspects of the project. On May 28, 2025, the government obtained a Superseding Information charging Mr. Miller with Securities Fraud (Count 1) and Aggravated Identity Theft (Count 3). PSR ¶¶ 1–2.

---

[7] See https://azgrounds.com; https://www.visitmesa.com/things-to-do/spectator-sports/arizona-athletic-grounds.

At first, Mr. Miller struggled to reconcile his actions with the harm caused. Upon Mr. Miller's review of the government's allegations, he recalled his conduct in this regard, and soon accepted the truth. He knowingly participated in forging documents, presenting inflated or unsubstantiated revenue projections, and disseminating misleading information in connection with the bond offering.

From the outset, Mr. Miller sought to resolve the case without unnecessary litigation. He cooperated with the government, agreed to forgo a lengthy pretrial motions practice and discovery disputes, and worked toward a prompt resolution to his misconduct.

On May 22, 2025, shortly after his indictment, he accepted a plea agreement, admitting to his conduct in open court. PSR ¶ 4. Since then, Mr. Miller has been forthcoming with the government and the Probation Office, candidly acknowledging that he exercised poor judgment when he substituted his own assumptions for the clear consent of others. He recognizes that forging signatures and altering LOIs to reflect interest that was not explicitly confirmed, was a serious lapse in judgment. Mr. Miller has expressed genuine remorse for these actions and has taken meaningful steps toward rehabilitation. Mr. Miller has engaged in individual therapy to address the emotional patterns underlying his conduct in this case, with his therapist attesting to his commitment to personal growth and preventing future lapses in judgment. PSR ¶ 109; Dr. John Michael Ltr. (Ex. 13).

Beyond his acceptance of responsibility in this instant matter, Mr. Miller also stipulated to an enforcement action brought against him by the U.S. Security and Exchange Commission ("SEC") for conduct related to the instant matter. Mr. Miller consented to the entry of judgment in that matter, whereby he has agreed to refrain from purchasing or selling securities, in addition to

other requirements. This judgment further reflects Mr. Miller's acceptance of responsibility for his conduct and his commitment to not engage in similar conduct in the future.

### AN EVALUATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Here, a sentence of incarceration beyond the mandatory minimum is unnecessary and would be greater than required under the statute. Courts must impose a sentence "sufficient, but not greater than necessary" under § 3553(a). The Sentencing Guidelines are no longer mandatory, and a sentencing court may depart from the Guidelines in the interest of justice. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007); *States v. Cavera*, 550 F.3d 180, 187-89 (2nd Cir. 2008). A sentencing court does not presume that a Guidelines sentence is reasonable; instead, the Guidelines are advisory and provide a "starting point and the initial benchmark" which the court considers along with the § 3553(a) sentencing factors. *United States v. Booker*, 543 U.S. 220, 245–46 (2005); *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Smith*, 949 F.3d 60, 66 (2nd Cir. 2020); *United States v. Crosby*, 397 F.3d 103, 111 (2nd Cir. 2005). Courts must consider the full range of § 3553(a) factors in tailoring a sentence. *Booker*, 543 U.S. at 245–46. After reviewing these factors, the Court must "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at 50, 52. The Court should impose the least severe sanction necessary to achieve the purposes of punishment established by Congress in § 3553. *United States v. Kloda*, 133 F. Supp. 2d 345, 347–48 (S.D.N.Y. 2001).

This District has embraced the view that the "utilization of non-incarcerative sentences needs to be increased." *United States v. Blake*, 89 F.Supp.2d 328, 346 (E.D.N.Y. 2000). A departure from the guidelines is especially warranted in an atypical case such as this because the Guidelines were only created as a "framework applicable to a 'heartland' of typical cases–embodying the conduct that a given guideline describes." *United States v. Bryson*, 163 F.3d 742,

746 (2nd Cir. 1998). When conducting an individualized assessment and analysis of the § 3553(a) factors as they pertain to Mr. Miller, we respectfully submit that the Court  impose a two-year sentence of incarceration for Mr. Miller.

## I.  18 U.S.C. § 3553(a): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

### A.  *Legal Standard.*

As this Court is aware, the primary focus of the sentencing inquiry is to determine a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553.  18 U.S.C. § 3553(a).  To assist with this determination, the statute provides seven factors the Court should evaluate in considering an appropriate sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for the applicable category of offenses committed by the applicable category of defendant as set forth in the [United States Sentencing Guidelines];

> (5) any pertinent policy statement issued by the United States Sentencing Commission;

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1) – (7).

As is set forth below, the application of these factors to this matter demonstrates that a sentence of two years' incarceration is "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553.

**B.  *The Circumstances of Mr. Miller's Non-Violent Offense Overstates His Culpability.***

One component of this inquiry is whether the defendant's conduct actually caused the losses attributed to him. In fraud cases, courts do not presume causation of loss. *See United States v. Rutkoske*, 506 F.3d 170, 179–80 (2d Cir. 2007). Sentencing courts should carefully distinguish between losses directly attributable to the offense and those caused by unrelated business or market factors. *Rutkoske*, 506 F.3d at 179–80 (remanding where the Court failed to exclude from its loss calculation the portion of a stock price decline attributable to market forces and other factors unrelated to the fraud). "Losses from causes other than the fraud must be excluded from the loss calculation." *Id.* at 179.

Subsequent cases have reaffirmed this standard. *United States v. Gushlak*, 728 F.3d 184, 196–97 (2d Cir. 2013) (*citing Rutkoske*, 506 F.3d 170 and *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) (the government bears the burden of showing that losses were proximately caused by the defendant's misconduct, rejecting the assumption that an entire stock decline could be attributed to fraud when broader market forces were at play). In *United States v. Tuzman*, the court recognized that any loss calculation must account for "market, industry, and firm-specific factors" before attributing investor losses to fraud, and found the government's loss figures overstated where causation was not shown with reasonable certainty. No. 15 Cr. 536 (PGG), 2021 WL 3284231, at *4–6 (S.D.N.Y. July 29, 2021).

Courts have cautioned against attributing losses or characterizing conduct in a manner that fails to account for the broader context in which an offense occurred. In *United States v. Rutkoske*,

the Court held that a sentencing court must "at least approximate the amount of the loss caused by the fraud without even considering other factors" and emphasized that "losses from causes other than the fraud must be excluded from the loss calculation." 506 F.3d 170, 179–80 (2d Cir. 2007). Similarly, in *United States v. Gushlak*, the court required the government to prove that losses were "directly and proximately" caused by the defendant's conduct, rejecting an approach that assumed all market losses were attributable to the fraud. 728 F.3d 184, 196–97 (2d Cir. 2013). And in *United States v. Tuzman*, the court stressed that any loss estimate must control for "market, industry, and firm-specific factors" before attributing losses to fraud, refusing to accept overstated figures where causation was not shown with reasonable certainty. No. 15 Cr. 536 (PGG), 2021 WL 3284231, at *4–6 (S.D.N.Y. July 29, 2021).

The Guidelines' mechanical application of the total loss amount thus fails to distinguish between losses directly attributable to the offense and those resulting from broader business failures and external events. *See U.S. v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("[a] defendant should have an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the loans."). A just sentence should consider not only the legal framework, but also the real-world context in which the loss occurred, and the fact that Mr. Miller's actions were not the sole cause of the project's demise.

Here, though Mr. Miller does not dispute the legal basis for the loss amount as calculated under the Guidelines, it is important to recognize that the collapse of Legacy Park was caused by factors unrelated to the conduct underlying Mr. Miller's conviction. Mr. Miller's conduct was wrongful and he accepts responsibility, the full collapse of Legacy Park resulted from several other independent and intervening factors (including OVG's nonperformance, construction overruns, the failure of promised financing, and broader market forces) that are well beyond the scope of his

conduct. Attributing the full loss to Mr. Miller would ignore both legal precedent and the factual record.

Legacy Park's collapse stemmed from a cascade of unforeseeable problems at the Park: construction overruns exceeding $100 million, repeated construction delays, operating lines and loans that never materialized, the COVID-19 pandemic, and OVG's failure to perform. *See* Jon Willis Ltr. (Ex. 1). To claim that the amended LOIs or consents to assignment caused the Park's collapse is far-fetched. In fact, during the Park's brief operational period, the sports division generated substantial and verifiable demand. Legacy Park secured over 800 contracts with sports organizations[8] (many of which involved multi-year or recurring programming) and actual attendance exceeded the projections in the 2020 LOM. See PSR ¶¶ 10, 81. These outcomes demonstrated an upward trend in attendance and revenue performance on the sports side.

To reduce the Park's collapse to fraudulent projections oversimplifies what occurred. Investors in municipal bonds are sophisticated, fully aware that LOIs are unenforceable expressions of interest rather than binding contracts. The bond disclosures themselves warned investors of this limitation. The sports-side results validated those projections, while the divisions managed by OVG failed to generate comparable engagement or profitability. OVG's failures gutted the overall model.

**C.  *Mr. Miller's Involvement Was Driven by Familial Relationship.***

Courts have recognized that family background and undue influence are relevant mitigating factors *See United States* v. *Hawkins*, 380 F. Supp. 2d 143, 164 (E.D.N.Y. 2005) (recognizing "the extreme pressures a young person is under trying to extricate himself or herself from a family with a criminal background"); *United States v. Johnson*, 964 F.2d 124, 129–30 (2d Cir. 1992) (affirming

---

[8] This was possible due to the existing contracts and the numerous additional business interests. *See* LOM Excerpts (Ex. 6 at 33–35, P-3).

a downward departure based on extraordinary family circumstances, emphasizing that family history may bear directly on culpability and sentencing); *United States v. Rivera*, 192 F.3d 81, 85–86 (2d Cir. 1999) (acknowledging that difficult family circumstances and pressures are relevant to the individualized assessment required by § 3553(a)(1)).

Mr. Miller became involved in the Legacy Sports project through his father, Randy Miller, whose influence over him was unfortunately shaped by years of emotional neglect. PSR ¶¶ 13, 101. Randy Miller had pursued the dream of building a large-scale sports complex for decades, and when the Mesa site finally emerged as a real possibility, Mr. Miller felt enormous pressure to step up and help his father. PSR ¶¶ 113–114. Mr. Miller had seen his father struggle and tirelessly work to make his business dream a reality, often at the expense of his family. While his personal relationship with father remained strained, Mr. Miller viewed working with his father at Legacy Sports as a means to earn his father's respect and admiration. Based on his personal history with his father, Mr. Miller begrudgingly accepted the role of CEO of Legacy Sports. PSR ¶¶ 113–114.

However, Mr. Miller quickly found himself in a role well beyond his capabilities, surrounded by others who had significantly more experience and who confirmed to him, through their complicity with practices such as enhancing revenue projections (based on a review of similar sports ventures and that historical data) and amending unenforceable LOIs, that such measures were necessary and acceptable given the nature of the financing venture. PSR ¶¶ 27–30. Ziegler's aggressive timelines and constant demands for revisions reinforced that message. Mr. Miller's trust in the Park project's more seasoned staff and his almost debilitating dependence on his father's approval clouded his judgment, and he knowingly and intentionally engaged in forging documents in connection with the bond offering.

### D. *Mr. Miller Served as a Part Time Employee During the 2016 Feasibility Study.*

The SFA study was prepared years earlier for a different concept, the Victory Lane Park project, and predated Mr. Miller's tenure as CEO. The notion that Mr. Miller "pulled" a five-page cover letter is incorrect. Even if the letter had crossed his desk, it would have carried no significance to him because it had been prepared years earlier for an entirely different project.

### E. *The PSR Does Not Capture OVG's Underperformance at the Park.*

OVG controlled two-thirds of projected revenues, about $55 million, through sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise. PSR ¶ 28; *see* OVG Operating Agreement (Ex. 2 at 23–25). Legacy Sports only oversaw the sports programming side, responsible for roughly $41 million, or 40% of total projected revenues. Legacy Sports did not prepare OVG's projections, did not represent that sports-side revenues alone could cover debt service, and never claimed the Park could survive if revenues underperformed by sixty percent. PSR ¶ 28; *see* OVG Operating Agreement (Ex. 2 at 23–25); *see also* Jon Willis Ltr. (Ex. 1). These revenue projections assumed OVG would deliver on its obligations and that the esports and training facilities would open as scheduled; assumptions that proved false due to construction failures and financing shortfalls. These overlapping issues at the Park, along with OVG's underperformance, are what drove the project into default.

### F. *Mr. Miller's Role in the Supplemental Bond Offering.*

Mr. Miller's responsibilities during the supplemental bond offering were limited to investor presentations based on materials prepared by others. *See* Jon Willis Ltr. (Ex. 1). Mr. Miller did not knowingly inflate projected revenues in connection with the supplemental bond offering. *See* PSR ¶ 27–28. His statements reflected supportable projections drawn from existing sports contracts and attendance commitments. Moreover, his statements were contingent on OVG delivering on its own

obligations, which Mr. Miller had no reason to believe OVG would fail in doing so. Attributing the full loss to Mr. Miller ignores these realities. PSR ¶ 81. Had OVG performed even to a reasonable standard, Legacy Park could have met its bond obligations.

### G. *Mr. Miller's Forfeiture Amount Does Not Reflect his True Financial Gain.*

Mr. Miller made significant sacrifices to keep the Park operational: deferred compensation, reinvested personal funds, and even paid payroll out of his own personal funds when cash flow collapsed. PSR ¶ 123; UMB Bank Statement (Ex. 16; filed under seal). Those sacrifices are a testament to his genuine belief in the project's viability and his desire to see it succeed for the community. The $4.79 million forfeiture figure cited in the PSR, while stipulated, does not provide all of the surrounding facts. PSR ¶ 4. Mr. Miller received funds from Michael Kuntz in connection with the sale of equity in Legacy Sports USA, but he immediately returned $3.25 million under a written agreement that Mr. Kuntz would use those funds to secure a loan for his own business purposes and, from those proceeds, contribute $15 million to Legacy Park operations. That arrangement never materialized, nor was the $3.25 million ever returned to Mr. Miller, leaving Legacy Sports without the anticipated infusion of capital.

Mr. Miller never diverted money to pay lawsuits, buy luxury cars or homes, or enrich himself with "hundreds of thousands of dollars" are unfounded. PSR ¶¶ 60–61. Mr. Miller never had control of Legacy Sports's bank accounts, never issued checks, and never withdrew funds. *See* PSR ¶ 60–61. Prior to the 2020 bond financing, Mr. Miller was never the subject of any lawsuits. Any supplemental compensation he received was for work he completed beyond his CEO duties, and he repaid those amounts out of an abundance of caution.

### H. *The Facts Surrounding this Matter do not Comprise the Typical White-Collar Case.*

Courts have long recognized the influence that dominant family members can have on a defendant's criminal conduct. *See United States v. Hawkins*, 380 F.Supp.2d 143, 164 (E.D.N.Y. 2005) ("It behooves us not to underestimate the extreme pressures a young person is under trying to extricate himself or herself from a family with a criminal background").

Mr. Miller did not orchestrate a calculated scheme to enrich himself. He joined Legacy Sports with the best intentions; as a son desperate to prove himself and make his father proud and with a genuine belief in the project's community value. PSR ¶¶ 13, 101, 113–114. Despite, having the label of CEO, Mr. Miller was often forced to defer to the judgement of others because of his inexperience in this area, leaving little room for independent judgment. Mr. Miller acknowledges that his actions directly contributed to the dissemination of materially false and misleading information to investors, and he acknowledges that his failure to question them was a serious lapse in judgment. To be clear, Mr. Miller was aware at the time of bond offering that his conduct relating to the LOIs and consent to assignments was inherently wrongful. The pressures surrounding the bond offering and  his constant inner turmoil to be accepted by his father caused Mr. Miller to ignore his unacceptable conduct, while hoping that the Park's success would validate his conduct in the end. The pressures of family dynamics, his lack of business training, and his reliance on seasoned advisors left him susceptible to poor choices and he made repeated mistakes as CEO of the Park.

## II. 18 U.S.C. § 3553(a): THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

Sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure [] that the punishment will suit not merely the offense but the individual defendant.'" *United States v. Huertero*, No. 20 CR. 580 (ER), 2022 WL 2712877, at *7 (S.D.N.Y. July 13, 2022) (*quoting Pepper v. United States,* 562 U.S. 476, 488 (2011)). A court

must sentence a defendant "as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2nd Cir. 2000). A defendant's post-offense rehabilitation is a significant sentencing consideration and may warrant a downward departure. Courts have recognized that the authority to depart may be based upon "significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior." *United States v. Rosado*, 254 F. Supp. 2d 316, 320 (S.D.N.Y. 2003) (*quoting United States v. Blake*, 89 F. Supp. 2d 328, 2000 WL 286685, at *11 (E.D.N.Y. Mar. 15, 2000).

Mr. Miller had lived a law-abiding life with no prior criminal history. PSR ¶ 105. His participation in the offenses did not stem from greed or malice but from a combination of familial influence, professional inexperience, and vulnerabilities tied to inexperience at Legacy Park. He understands that when he set aside his better judgment and amended certain documents in furtherance of the Park's creation, he directly contributed to the harm investors and the community suffered. Mr. Miller looks forward to redeeming himself and proving that his conduct in this case does not define his character. Mr. Miller, as he stands before this Court today, is not the same man who deferred to others in a misguided effort to fulfill his father's vision. He is a man who has reflected on his failures, engaged in therapy, and taken meaningful steps to ensure he never repeats these mistakes.

A. ***Mr. Miller Serves as the Primary Caretaker for His Two Young Children.***

The Court should also consider a defendant's family circumstances at the time of sentencing when determining an appropriate sentence under 18 U.S.C. § 3553(a). *United States v. Greene*, 249 F. Supp. 2d 262, 265–66 (S.D.N.Y. 2003) (recognizing that while family circumstances are generally a discouraged basis for departure, extraordinary family circumstances may justify leniency where incarceration would cause "extraordinary destruction on dependents

who rely solely on the defendant"). Mr. Miller is a devoted and hands-on parent to his two young children who extraordinary rely on him for daily care, emotional support, and stability. PSR ¶ 102. Mr. Miller shoulders 50/50 custody responsibilities while also serving as his family's sole financial support. The events of this case have only deepened Mr. Miller's resolve to be a present and positive influence in his children's lives. He has made a conscious effort to rebuild a home environment founded on trust, open communication, and emotional availability; qualities he himself was often denied in his own upbringing.

Mr. Miller has remained unwavering in his devotion to his two children, ages 8 and 4. PSR ¶ 102. He has embraced his role as a single father and primary caregiver and is intent on breaking the cycles that defined his own childhood. Mr. Miller's focus is on providing emotional support and daily care to at a time when they need him most. He manages their schooling, extracurricular activities, and day-to-day needs while ensuring their lives remain as stable as possible amidst uncertainty. Mr. Miller's children are entering their formative years and a lengthy incarceration would deprive them of a parent they rely on for guidance, nurturing, and love (as detailed in the provided character letters submitted as Exhibits 14 and 15).[9]

## III. 18 U.S.C. § 3553(a)(2). THE NEED FOR THE SENTENCE IMPOSED.

### A. *Mr. Miller's Post-Offense Rehabilitation and Efforts to Begin a New Chapter in His Life.*

Section 3553(a)(2) provides that the Court must consider "the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to

---

[9] Character Ltrs. Part 1 (Ex. 14); Character Ltrs. Part 2 (Ex. 15; filed under seal). *See* Braden Johnson Ltr.; Nathan Averill Ltr.; Karen Gerlach Ltr.; Paige Julius Ltr.; Keith Black Ltr.; Scott Coleman Ltr.; John P. Julius, DO Ltr.; Stephanie Peterson Ltr.; AJ Ford Ltr.; Colin Krapff Ltr.; Brett Miller Ltr.; Mike DiFabbio Ltr.; Kalvin Bay Ltr.; Armando Andrew Meza Ltr.

protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Within this framework, Courts have recognized that extraordinary rehabilitation may warrant a reduced sentence. *See United States v. Cusack*, 66 F. Supp. 2d 493, 496 (S.D.N.Y. 1999) (downward departure may be based on post-conviction rehabilitation where the Guidelines "did not adequately consider rehabilitation efforts undertaken at various times").

The months following Mr. Miller's indictment were the darkest of his life. He not only faced financial strain but also the public stigma of his conduct. Friends and colleagues called him, questioning how he could have become involved in such misconduct. Professional opportunities vanished overnight. He laid awake at night worrying about what his children would one day read about him; fearing that their image of him would be defined by his worst mistakes instead of the love and sacrifices he has made. The collapse of Legacy Sports was both a public failure and a deeply personal reckoning.

Since then, Mr. Miller has devoted himself to rehabilitation, with fatherhood as his central purpose. His children are not only his greatest joy and his deepest motivation to change. He remains steadfast in caring for his children, ensuring that their lives remain nurturing and consistent despite the upheaval of these proceedings. PSR ¶ 102. His care for them provides both a renewed sense of purpose and a daily reminder of why he must never repeat this conduct. Every milestone in their young lives (birthdays, school achievements, daily moments of comfort and guidance) is time he will never be able to reclaim if he receives a lengthy sentence.

Mr. Miller has taken proactive therapeutic steps to address the underlying issues that led to his offense. In March 2024, he began therapy with Dr. John D. Michael, Ph.D., LPC, to confront

his history of paternal control, his long-standing need for approval, and his tendency to defer to authority figures. PSR ¶ 109. Through therapy, Mr. Miller has gained insight into how these emotional vulnerabilities clouded his judgment and led to his misconduct. *See* Dr. John Michael Ltr. (Ex. 13).

**B.** ***A Minimum Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.***

In determining an appropriate sentence, the Court must consider whether the punishment reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public from future offenses, and ensures that the defendant receives any necessary educational, vocational, or therapeutic support in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)–(D). Courts recognize the devastating weight of such collateral consequences. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 188 (E.D.N.Y. 2016) (acknowledging that the "collateral consequences of a felony conviction [are] remarkably severe and are sometimes life-long").

Mr. Miller did not act out of greed, nor did he seek to enrich himself at the expense of others. On the contrary, he reinvested his own money to cover payroll, keep operations afloat, and demonstrate his belief in the project. Although the government focuses on the amended LOIs and consents to assignment, these background documents did not cause the collapse of the Park. That collapse stemmed from far more consequential factors: unanticipated construction overruns exceeding $100 million, delayed and often nonexistent funding, the COVID-19 pandemic, and OVG's failure to deliver on its contractual obligations (which comprised the majority of the Park's projected revenue). Despite Mr. Miller's many efforts to keep the Park afloat, he has been publicly portrayed as the architect of a complex fraud. That label inflicted irreparable reputational harm,

cost him his most recent job, and foreclosed future opportunities. The punishment he has already endured far exceeds any financial benefit he received.

Most importantly, Mr. Miller serves as the primary caregiver to his two young children. Courts have repeatedly acknowledged that family circumstances, particularly the impact on minor children, are an important consideration under § 3553(a). *See United States v. Greene*, 249 F. Supp. 2d 262, 265–66 (S.D.N.Y. 2003). Mr. Miller's children are navigating critical developmental years in which consistency, guidance, and parental presence profoundly shape their emotional security and long-term well-being. Incarcerating Mr. Miller for longer than necessary would not only punish him, but also inflict lasting harm on two children who depend on him. They look to him for everything from homework help to emotional reassurance to the daily routines that provide them with a sense of stability and safety.

In light of these realities, a two-year sentence of incarceration is "sufficient but not greater than necessary" to reflect the seriousness of Mr. Miller's offense, promote respect for the law, and provide just punishment, while avoiding needless harm to two children who deserve stability during their most formative years.

### C. *A Minimum Sentence for Mr. Miller is an Adequate Deterrent and Also Protects Public from Further Crimes.*

Mr. Miller has already endured punishments that extend far beyond the courtroom: the collapse of his career, financial ruin, public humiliation, and the permanent stigma of a felony conviction. These consequences send a clear message to others in positions of trust that misconduct carries devastating, lifelong repercussions. *See United States v. Carbon*, No. 12-CR-680, 2013 WL 5728253, at *2 (E.D.N.Y. Oct. 22, 2013) (general deterrence satisfied by conviction and collateral consequences). Specific deterrence is also satisfied; Mr. Miller's life has been irrevocably altered. He has been ostracized from professional circles, faces significant barriers to future employment,

and will bear the collateral consequences of his felony conviction indefinitely. *See Adelson*, 441 F. Supp. 2d at 514 (recognizing extraordinary non-custodial punishments, including loss of career and reputation).

Mr. Miller's post-offense rehabilitation efforts (therapy, rebuilding his professional identity, and unwavering commitment to his children) show he poses no risk of reoffending. Moreover, he has taken deliberate steps to address the emotional and psychological patterns that contributed to his conduct, ensuring that he never repeats those mistakes. Mr. Miller's treating therapist, Dr. John D. Michael, Ph.D., LPC, has affirmed that Mr. Miller poses no risk to the community. Dr. Michael reported: "it appears that Chad is ready to accept impeding outcomes, and is a good candidate to complete the necessary work to reinforce his sobriety, reconcile his past traumas, and restore himself with his family and community." Dr. John Michael Ltr. (Ex. 13). This assessment confirms that a lengthy sentence is unnecessary to protect the public. *See United States v. Cadle*, No. 04-CR-750, 2009 WL 1764980, at *2 (E.D.N.Y. June 11, 2009); *United States v. Johnson*, No. 09-CR-81, 2011 WL 2387812, at *2 (E.D.N.Y. June 8, 2011).

For Mr. Miller, that means a two-year sentence of incarceration that preserves his access to intensive therapy, allows him to see his two young children, and ensures he remains accountable while rebuilding his life. Courts have recognized that incarceration often limits access to trauma-informed care, undermining rehabilitation rather than advancing it. *See United States v. Harris*, 349 F.Supp.3d 221, 223-224 (noting the lack of trauma-informed mental health treatment in prison as a mitigating factor).

As detailed in Section V *supra*, Mr. Miller has actively engaged in biweekly therapy with Dr. John D. Michael, Ph.D., LPC, since March 2024, addressing the underlying emotional and psychological factors that contributed to his offense conduct. PSR ¶ 109. Their work has focused

on the very issues that left Mr. Miller vulnerable: his history of paternal neglect, his chronic need for approval, his tendency to defer to authority, and his reliance on alcohol to manage stress. Dr. John Michael Ltr. (Ex. 13). Mr. Miller entered therapy carrying unresolved trauma, guilt, and anxiety. Through sustained effort, he has begun to break destructive patterns, build healthier coping mechanisms, and accept full responsibility for his actions. Mr. Miller's therapeutic progress has been substantial, but it remains an ongoing process that requires consistency. A lengthy sentence would sever this critical treatment and risk undoing the gains he has achieved.

A two-year sentence would preserve these gains. This approach fulfills the objectives of § 3553(a)(2)(D) by addressing Mr. Miller's rehabilitative needs in the most effective manner while ensuring punishment, accountability, and protection of the public. A lengthy imprisonment would interrupt this trajectory, serving no additional corrective purpose beyond the severe consequences already imposed on Mr. Miller.

## IV. BUREAU OF PRISON DESIGNATION.

We respectfully request that this Court provide a judicial recommendation to the Bureau of Prisons that Mr. Miller be designated to the minimum security satellite camp at USP Tucson, located in Tucson, Arizona. Such a designation would allow for family visitation with his two young children and facilitate an eventual successful reentry into the community. The satellite camp at USP Tucson is well suited for Mr. Miller because of the circumstances surrounding his non-violent offense, his closeness and need for proximity to his children, and the importance to his rehabilitation that he be close to his family.

## CONCLUSION

While the Guidelines provide a starting point, they are advisory. The Court must impose a sentence individualized to Mr. Miller's history, the true nature of his conduct, and the statutory

purposes of sentencing. His case differs significantly from typical white-collar prosecutions. Mr. Miller did not orchestrate a scheme for personal enrichment, nor did he profit from the offense. Instead, he reinvested his own funds, deferred his compensation, and worked tirelessly in an effort (however misguided) to salvage a project that was his father's lifelong dream.

It is too simple to blame Mr. Miller for Legacy Park's collapse. Here, the failure arose from overlapping operational deficiencies, pandemic disruptions, and systemic failures by third-party operators and financiers; many of whom profited while avoiding long-term risk. Moreover, the record demonstrates that Legacy Park's sports programming exceeded attendance projections, disproving the claim that Mr. Miller knowingly inflated attendance figures. Legacy Park's strong attendance numbers should have generated significant revenue, but key infrastructure components essential to unlocking and supporting those revenue streams never came to fruition. Punishing Mr. Miller as the sole scapegoat ignores these broader operational and financial realities.

Mr. Miller's involvement in Legacy Park grew not out of greed or malice, but out of emotional dependency, professional inexperience, and misplaced trust in others. The consequences he has already suffered are severe: the loss of his career, financial ruin, public humiliation, and the lifelong stigma of a felony conviction. Despite these hardships, Mr. Miller has shown through therapy, parenting, and professional reinvention that he has learned from his mistakes and is committed to living a law-abiding, productive life.

Dated: August 26, 2025
      Phoenix, Arizona

                    Respectfully submitted,
                    /s/  Hector J. Diaz
                    Hector J. Diaz
                    DIAZ LAW PLLC
                    8777 E. Via de Ventura, Suite 350
                    Scottsdale, AZ 85258
                    (602) 796-6253
                    *Attorney for Defendant Chad Miller*