

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 2, 2025

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

  Re: *United States v. Chad Miller*, 25 Cr. 138 (LAK)

Dear Judge Kaplan:

  The Government respectfully submits this memorandum in advance of the September 9, 2025 sentencing for defendant Chad Miller.

  The defendant and his co-conspirators, including his father, Randy Miller, forged documents and falsified revenue projections to convince investors to purchase over a quarter billion dollars in municipal bonds that the defendant sold to build Legacy Sports Park ("Legacy Park") in the Arizona desert. Legacy Park ultimately was not financially viable, and the bonds are now worthless, resulting in hundreds of millions of dollars in losses to investors. In the course of their scheme, the defendants—in particular, Chad Miller—also committed aggravated identity theft by using the identities of dozens of individuals to make it appear there was real customer interest backing the bond offering.

  For the reasons set forth below, the Government respectfully submits that a sentence of 80 months' imprisonment would be sufficient but not greater than necessary to achieve the purposes of sentencing.

### I. Background

#### A. The Offense Conduct

  Chad Miller was the CEO of Legacy Sports USA LLC ("Legacy Sports"), which operated Legacy Park, a massive sports and entertainment complex in Mesa, Arizona. From in or about November 2019 through at least in or about July 2021, Chad Miller, his father Randy Miller, who was the President of Legacy Sports, and others lied to bond investors about the volume and level of interest that youth sports organizations had in using Legacy Park. (PSR ¶ 9). The Millers and their co-conspirators fabricated and forged letters of intent and so-called "pre-contracts" that bore the names of persons and organizations that did not approve them, including youth sports programs and other sports-related organizations. (PSR ¶ 10).

These forged documents claimed that major sports organizations had made binding commitments to use Legacy Park for a fabricated number of tournaments, with fabricated numbers of participants and expected spectators. Some of these forgeries were created from whole cloth by the defendants and their co-conspirators. Others used as their starting point real letters the defendants had obtained from sports organizations that expressed soft interest in or support for the Park, which the Millers fabricated into "binding" commitments to relocate to Legacy Park and inflated the importance of the commitment by adding fictious events, tournaments, or participants to the details, if any, that the organization had actually provided in the original letter. The Millers then used these forged documents to generate falsely inflated projected revenues for Legacy Park, which were presented as projections to prospective bond purchasers based not on mere speculation or market research, but on the supposed binding commitments of over 50 sports organizations.

The defendants conveyed these forged documents and fraudulent projections to prospective investors to obtain approximately $284 million in municipal bond financing. (PSR ¶ 11). Specifically, to build Legacy Park, the Millers sold investors revenue-backed municipal bonds issued by the Arizona Industrial Development Authority, acting as a conduit for the entities that controlled Legacy Park—*i.e.*, bondholders would be paid only from the revenue generated by the Park. In the initial bond offering memorandum (the "Initial Offering Memorandum"), investor presentations, and materials made available to potential investors in a data room (the "Data Room"), the Millers claimed that Legacy Park expected to generate approximately $96.3 million in revenue after its first full year of operations in 2022. (PSR ¶¶ 22-23, 27-28, 29). That projection was based substantially on these false letters of intent and pre-contracts, which the Millers used to model that Legacy Park would be 100% occupied from opening and be able to meet the debt service commitment of the Legacy bonds. (PSR ¶¶ 23, 27).

In August 2020, the initial bond offering closed and generated approximately $251 million in bond proceeds. (PSR ¶ 33). In June 2021, Legacy Park raised another approximately $33 million in a supplemental bond offering that continued to incorporate these misrepresentations from the initial bond offering. (*Id.*).

Legacy Park opened in or about January 2022 and immediately began underperforming the Millers' revenue projections. (PSR ¶ 65). The park generated only approximately $14.7 million in revenue in its first six months of operation, as compared to $96.3 million that the Millers had projected Legacy Park would make in 2022. (PSR ¶ 65). In particular, Legacy Park was 43% off its budget in the first quarter of 2022 and 59% off budget in second quarter of 2022. (PSR ¶ 65). Legacy Park failed to make a single payment on its bonds. The first bond payment came due in August 2022, Legacy Park defaulted in October 2022, and then declared bankruptcy in May 2023. (PSR ¶ 67-70). Bondholders recovered no more than approximately $2.5 million in total—less than 1% of their investment.

The defendants' forgery scheme dates back to well before the Ziegler-led municipal bond financing effort commenced. Randy Miller began soliciting interest in building what ultimately became Legacy Sports Park almost 20 years prior. Chad Miller, a former professional baseball player, initially began working for Randy Miller on the Legacy Park project on a part-time basis in the mid-2010s. (PSR ¶ 13). There were at least three iterations of the project at different sites in Arizona over the years, and, at various times, Randy Miller worked with different financial backers

and construction companies to try to generate sufficient investment to facilitate the building of the sports park. (PSR ¶ 13).

As part of that plan, Legacy Sports hired Sports Facilities Advisors ("SFA") in 2016 to perform a third-party feasibility study on the proposed project, which the Millers intended to use to solicit investors in the project. (PSR ¶ 14). Both Randy and Chad Miller met with members of the SFA team as SFA conducted its feasibility study. (PSR ¶ 15). SFA ultimately refused to validate Legacy's extremely aggressive assumptions about the financials of the project. (PSR ¶¶ 15-16). Instead, SFA issued a pro forma using the assumptions that Randy Miller directed, but caveated that report with several stark warnings: the assumptions were directed to be included by Randy Miller and his team; SFA had not validated that data; and SFA did not anticipate Legacy Park would perform as Randy Miller hoped. (PSR ¶¶ 17-18).

By at least January 2018, the Millers and their co-conspirators started using the numbers SFA generated to solicit investors, but specifically excluded the express caveats SFA had included and changed the date of the study to make it look nearly a year more recent. (PSR ¶ 19). And the Millers substituted their own cover letter in their business plans that stated, contrary to SFA's actual conclusions, that SFA had "concluded that [all] the information provided meets their requirements for acceptance and validation into the development of this pro forma." (PSR ¶ 19). These business plans included letters of intent that even by as late as April 2019, six months before the Millers were introduced to Ziegler, were forged and altered to inflate anticipated attendance and revenues.

Chad Miller claims to not recall seeing SFA's five-page disclaimer letter caveating the pro forma, and claims that, had he seen it, it would have carried "no significance" for him given its age in 2020; he also contends that in 2016 he had a much less significant role in the project than his father as he was working only part-time. (Def. Ltr. at 22). The Government does not dispute that, as of 2016, Randy Miller was the driving force both strategically and operationally behind the Legacy Park project. But the Government is skeptical that Chad Miller was not aware of SFA's conclusions. Chad Miller participated in meetings with SFA, was presented to SFA alternatively as Legacy Sports' President and Vice President, sitting just below Randy Miller and two c-level executives, and above all operations management. SFA transmitted the cover letter and pro forma to Legacy Sports' financing partner in the same email. And that partner recalls sending the conclusions to both Randy and Chad Miller.

Moreover, in December 2018, Chad Miller and Randy Miller participated in a meeting with a different SFA partner, where they asked that partner to prepare a letter that validated certain limited additional assumptions they were making about changes in fees and hosting events. The letter was intended to be given to Arizona state authorities in support of tax benefits for the project. The SFA partner provided the requested letter, which Chad Miller and his co-conspirators then used in the bond offering, inappropriately, as a replacement cover letter for the 2016 disclaimer letter that Chad Miller claims a lack of recollection over.

In November 2019, when Zeigler agreed to assist the Legacy team in financing the project through municipal bonds, Chad Miller and his co-conspirators turbocharged their fraud. As outlined in the tables in paragraphs 45 and 46 of the PSR, the defendant and his co-conspirators

forged or misleadingly altered letters of intent or pro-forma contracts for 35 of the 54 organizations who were purportedly committed to the Legacy Park project, accounting for nearly 30% of the anticipated $96 million in year one revenue investors were told Legacy Park expected to generate. (PSR ¶¶ 45-47). The defendant's fraud included forging and copying signatures for marquee sports organizations like the Special Olympics, the Fiesta Bowl, Manchester United, Real Salt Lake, and many other youth sports organizations that had no idea the Millers were forging or altering their documents and using their names and reputations to solicit interest in the park. (PSR ¶¶ 34-44).

The forgeries spanned all types of documents used to get the bond offering over the finish line. It started with the letters of intent that the Legacy team had been soliciting as early as the SFA days in 2016. When Zielger suggested Legacy ask their customers to sign so-called "pre-contracts" that would show a firmer intent to use the Park when it opened, the Millers forged the vast majority of those pre-contracts. For example, Chad Miller directed an associate to alter a prior letter from the Arizona Youth Soccer Association to make the letter appear to be a pre-contract, with language stating that the agreement "establishes a contract," wherein AYSA agreed to reserve 48 fields with 300-350 teams per tournament, for 28 tournaments, for a ten-year period. (PSR ¶¶ 30 35). Chad Miller similarly directed an associate to forge the signature of the CEO of Special Olympics Arizona on a pre-contract that included vastly overstated participant attendance and headcount numbers for events held by the organization. (PSR ¶ 35). When the financing legal team asked for customers to sign assignments that would move their commitments from Legacy Sports to Legacy Cares, the non-profit that formally owned the Park, the Millers forged those too. (PSR ¶¶ 38-42).[1]

Chad Miller's sentencing brief appears to shift primary responsibility for the forging to Legacy Sports' Chief Operating Officer, Jeff De Laveaga, whom Miller contends said they did not need to obtain new LOIs for every organization because of De Laveaga's history with the organizations. Miller also claims that "De Laveaga, and others, implicitly confirmed the validity of the amendments to the LOIs when these more seasoned employees acquiesced to this conduct; providing dates, tournaments, and expected attendance in the amended LOIs." (Def. Ltr. at 7-8). De Laveaga knowingly participated in the forgery scheme and pled guilty for his conduct. *See United States v. Jeff De Laveaga*, 25 Cr. 127 (RA). But the evidence collected by the Government shows that: (1) the Millers fraudulently altered letters of intent even before De Laveaga joined the Legacy team; (2) many of the letters and the majority of the pre-contracts were forged without De Laveaga's involvement, even after he joined Legacy, including the Fiesta Bowl letters and others; and (3) De Laveaga engaged in this scheme at the direction of Randy and Chad Miller, who were ultimately responsible for the fraud and profited the most from it.

---

[1] Chad Miller's sentencing memo suggests that the COVID pandemic prevented the Millers from obtaining valid assignments because the defendants "could not easily revisit every sports organization." (Def. Ltr. at 8). This suggestion is perplexing given that the defendants could have sought and obtained legitimate signatures over email. In any event, to the extent signatures, which the defendants did not even attempt to obtain legitimately, were more difficult to obtain during parts of the COVID-19 pandemic, this is hardly an excuse for the defendants fabricating and fraudulently copying signatures. Nor does it explain the forgeries and alterations from 2016 through February 2020, all pre-COVID.

For example, the SC del Sol pre-contract, which was used to estimate approximately $833,500 in year one direct revenue, was a flat-out forgery that Chad Miller prepared with the assistance of two consultants, and without De Laveaga. Similarly, Chad Miller was the Legacy person who had a relationship with the Fiesta Bowl, which he falsely claimed to bondholders was going to contribute approximately half a million dollars in year one direct revenue to Legacy Park. Again, both the letter of intent and pre-contract for the Fiesta Bowl, which promised to relocate three tournaments to Legacy Park, were complete forgeries created by Chad Miller and his co-conspirators, and without De Laveaga.

Chad Miller repeatedly directed others, including a consultant working with him, to copy signatures from the letters of intent to the forged assignment letters. (PSR ¶ 38). As just one example, on June 3, 2020, Chad Miller emailed a construction consultant working on the Legacy Park project, "here are a few more Consent to Assign forms that need your 'special touch.' lol. All of these forms have original signatures from their LOI's, its just very hard to decipher on these forms." (PSR ¶ 39). The following day Chad Miller texted the same consultant that he had uploaded all of the consent to assign forms and stated that they all needed to check the spelling, dates, and fonts, instructing, "Don't want to get in trouble just because we didn't do a quality control review lol." (PSR ¶ 40).

These forgeries supported the bond offering in multiple ways. First, the forged documents—the letters of intent and pre-contracts—were themselves made available to potential investors through the electronic Data Room that Ziegler provided. (PSR ¶ 29). Second, the Millers used the inflated attendance and revenue projections they fabricated in those documents to generate revenue projections in a spreadsheet called the pro forma, which was also made available to investors and incorporated into various investor documents like the Initial Offering Memorandum. (PSR ¶¶ 32, 44). Chad Miller specifically worked on the pro forma that modeled the data, which was made available to investors. (PSR ¶ 32).[2]

Chad Miller claims that the attendance projections were "based on limited research and historical data obtained from other similar sports complex projects" and that the Millers "deferred to other Legacy Sports' executives, who confirmed to them that these practices were acceptable given the existing relationships between Legacy Sports and the several sports organizations." (Def. Ltr. at 9). This is contrary to the evidence obtained by the Government, which supports that, as far back as 2016, Randy Miller was directing people involved in the Legacy Park project, such as SFA, to incorporate wild and facially implausible assumptions into sports revenue projections. (*See* Gov't Sent. Ltr. R. Miller at 4-5)

Similarly, when preparing the projections for Ziegler, documentary evidence shows that Chad Miller directed others to inflate projections to increase revenue, without any "deference" or support. For example, when De Laveaga sent Chad Miller and Jeff Puzzullo a revised pro forma estimate using a forged volleyball club letter of intent and pre-contract that falsely projected approximately $1.4 million in year one direct revenue from that club, De Laveaga wrote in the

---

[2] For the Court's benefit, the Government is filing the Initial Offering Memorandum as Exhibit A, the slide deck used during the investor presentation as Exhibit B, a transcript of the investor presentation as Exhibit C, and the pro forma made available in the data room as Exhibit D.

subject line, "This will final[ly] make Chad happy, increased Rev[enue] by $700K." (Ex. E). The attachment falsely inflated the number of events and attendees expected from the volleyball club from the original noncommittal letter provided by the club owner.

Third, the Millers touted the false commitments to Legacy Park and the supporting revenue projections in both the Offering Memorandum and in the investor presentation that Chad Miller, Ziegler, and others held prior to the bond offering closing. (PSR ¶¶ 27, 44, 49). For example, on July 8, 2020, Chad Miller gave a webinar presentation to potential bond investors, wherein he presented a slide deck that touted the commitments from over 50 organizations that had signed letters of intent and pre-contracts that would ensure Legacy Park would be "at or near 100% occupancy on day one of opening." (PSR ¶ 27). Miller touted the firmness of the commitments in the forged letters, stating "[A]ll of the organizations who have submitted either a binding letter of intent or have had an executed agreement with us, have been operating for 10, 20, 30 plus years in a lot of these instances," and that "all of those will be converted into official contracts within 90 days after groundbreaking. So this slide really illustrates the percentage in revenue that has already been achieved by having these agreements executed by these parties." (Ex. C at 7). Miller also claimed that the sports leagues' commitments supported the projected revenue, which he claimed would be sufficient to make the required bond payments. (PSR ¶ 27). Miller explained to investors that Legacy Park expected to generate $23 million in direct revenue from its first year of operations, based on 25 organizations that had purportedly signed pre-contracts, and approximately $18.9 million from 26 organizations that had signed letters of intent. (PSR ¶ 27).

Miller asserts that, in the bond offering materials, Legacy Sports "limited their projected revenues to only those related to sports programming," and that the remaining two-thirds of revenue projections were prepared by Oak View Group ("OVG"), which operated aspects of the park like concessions, parking, and attendance. (Def. Ltr. 8-9; *see also id.* at 22 ("Legacy Sports only oversaw the sports programming side … [it] did not prepare OVG's projection ….")). This is contradicted by the offering materials themselves, which state that the projected revenue for indirect revenue categories such as ticketing, concessions, bars/restaurants, parking, merchandise, etc. that were purportedly OVG's responsibility were based on the false and misleading customer projections the Millers assembled for direct sports revenue, namely, that, based on expected demand, it was reasonable to project over 3.68 million yearly visitors to the park who would spend the projected amounts in those areas. (Ex. A at 117 ("The Legacy Sports Park is estimated to attract over three million visitors per year. These figures are based upon events identified through the binding pre-contracts and Letters of Intent ('LOIs') and multiplier assumptions provided by The Sports Facilities Advisory ('SFA'), the consultant that developed the feasibility study, and confirmed by OVG Facilities (the 'operator') and Johnson Consulting (the 'Peer Review Consultant').")).

Moreover, the Initial Offering Memorandum and pro forma model approximated $41.9 million in direct sports revenue, or approximately 43% of total year one revenue, and the balance of $54.3 million, or approximately 57%, from indirect revenue, not one-third/two-thirds. And again, the pro forma prepared by Chad Miller, Randy Miller and others at Legacy Sports modeled that the bulk of that indirect revenue was driven by the Legacy-prepared assumption of 3.68 million yearly visitors. That was not an OVG-prepared or driven projection.

And fourth, the defendants used the fabricated letters to support the purported validation of the project, both through the altered and misleadingly presented SFA analysis, and through the "peer review" of the SFA study by Johnson Consulting. (PSR ¶ 48). Chad Miller claims that his awareness of the SFA study was tangential Ziegler's reference in the Initial Offering Memorandum to SFA being engaged to review the 2020 bond offering was done without his knowledge. (Def. Ltr. at 7, 9). But, notwithstanding his awareness of the portions of the Offering Memorandum that Ziegler drafted, Miller ignores his personal role in directing the inclusion of the fraudulently altered SFA study to support the bond offering. In May 2020, when Chad Miller, consultant Jeff Puzzullo, and another Legacy consultant were working on the pro forma spreadsheet, Miller commented that "We still need to incorporate the original feasibility study somehow. Whether that be through labeling, or whatever, but we need to make sure that we include some of the feasibility study somehow." (Ex. F at 2). Puzzullo responded, puzzled, "Regarding SFA, we need to look at the old and new pro forma side by side to determine what you are trying to salvage from SFA because their data is now obsolete." (*Id.* at 1). Miller responded that he would call Puzzullo. After that, the language in the portion of the Initial Offering Memorandum that the Legacy team, not Ziegler, directly prepared (Appendix A), began including the language that "SFA has reviewed and analyzed the revised business model, utilizing its proprietary data base, and affirmed its prior findings regarding feasibility and the increased revenue to be generated as a result of the additions" and that SFA had conducted an "independent analysis" and "feasibility study" in support of the project. (Ex. A at 152, 154).

Chad Miller continued his campaign of forging documents to prop up the 2021 Supplemental Bond Offering as well. While Miller claims that he did not "knowingly inflate projected revenues in connection with the supplemental bond offering" (Def. Ltr. at 22), that assertion is contradicted by the evidence. For example, on June 8, 2021, Chad Miller emailed De Laveaga the revised pro forma for the supplemental bond offering and directed him to make sure "the information in the contracts is reflected in the tabs tied to the revenue for each organization/event," identifying discrepancies between the contract list and the pro forma. (PSR ¶ 57). He emphasized the importance of this to that offering, writing, "This is a top priority…. We're talking about a $30Million in investment." Three days later, De Laveaga emailed Chad Miller a forged agreement purportedly signed by the owner of the Arizona Youth Soccer Association wherein AYSA purportedly agreed to pay Legacy Park eight times the amount they had actually agreed to pay Legacy Park, with the note "Replace A[Y]SA with this one." (PSR ¶¶ 57-58). There is no doubt that Miller knew that was a forgery—the contracts were dated the same, and De Laveaga had sent him the real contract in January 2021. Five days later, on June 16, 2021, the Supplemental Bond Offering closed, raising an additional $33 million for Legacy Park in the municipal bond markets.

Chad Miller continued to lie to investors until the bitter end. On August 30, 2022, weeks after Legacy Cares had failed to make its first bond repayment, Miller told investors that the company was "right on track in the fall and winter heading into a position where we don't anticipate having any shortfalls whatsoever in regards to those payments next year. Everything is trending and tracking as we suspected it would the second part of this year, so, no, we're very confident in the revenue anticipation and the partnerships that we have." (PSR ¶ 67). Two days later, Legacy Cares failed to make its second bond payment and a little over a month later, the trustee for the bonds issued a Notice of Defaults. (PSR ¶¶ 68-69).

And Chad Miller and his father made millions directly off the fraud. When the bond proceeds hit the Legacy Sports operating account that Randy Miller controlled, Randy Miller used the funds to pay himself and his family members extravagant salaries, purchase luxury vehicles for their personal use like a $135,000 Cadillac Escalade for Chad Miller, pay off other debts, and fund their next ventures. In addition to receiving the six-figure luxury car, Chad Miller received $450,000 a year in salary in 2021 and 2022 and received approximately $346,000 in cash that was withdrawn from a Legacy Sports bank account between October 2020 to June 2021.[3] He repaid approximately $347,199, only after Legacy's CFO (and former investment banker at Ziegler) caught some of the misspending and confronted the Millers, demanding that they repay what they had taken and "pray this isn't questioned." (PSR ¶ 64). To make those repayments, Chad Miller solicited a third party who purchased $3.5 million in Legacy Sports equity from Chad Miller (PSR ¶ 64), after receiving many of the same false financial documents that were provided to Legacy Park bond investors.[4] In total, Chad Miller is being held responsible for approximately $4.79 million in forfeiture based on his direct control over these misappropriated funds.

**B.    The Defendant's Plea, Guidelines Range, and Monetary Penalties**

On April 1, 2025, the defendant was arrested on the charges in the indictment (the "Indictment"), which charged four counts: one count of conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371; one count of substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5; one count of substantive wire fraud, in violation of 18 U.S.C. § 1343; and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

On May 28, 2025, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement") before Magistrate Judge Robyn A. Tarnofsky, to Counts One and Three of the S1 superseding information (the "Information"), which charged the defendant with securities offering fraud, in violation of 15 U.S.C. §§ 77q & 77x, and 18 U.S.C. § 2 (Count One) and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 2 (Count Three).

As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Sentence is 60 months' imprisonment, with a mandatory consecutive 24 months' imprisonment on Count Three, for a total of 84 months' imprisonment. (PSR ¶ 146.) Probation recommends the defendant be sentenced to a below-Guidelines sentence of 66 months'

---

[3] Chad Miller claims that he deferred fees he was entitled to after the closing of the bond financing. (Def. Ltr. at 13). To the extent he is referring to the Legacy Sports Development Fee disclosed in the Initial Offering Memorandum (Ex. A at 58), the Legacy Sports Project did not clear the debt service ratio hurdles required to earn that fee, nor was such a ratio calculated by a year-end audit, as required.

[4] Chad Miller argues that he was not enriched from this sale of equity because he "returned" $3.25 million of the proceeds from the sale to Kuntz under a written loan agreement. (Def. Ltr. at 13). This loan happened eight months after the equity sale, in or about May 2022. The fact that Miller loaned Kuntz $3.25 million months after selling him a multi-million-dollar equity stake based on the same misrepresentations presented to bondholders in an effort to secure an additional business loan does not mitigate the fact that the initial sale was a personal benefit to Chad Miller.

imprisonment. (PSR at 45.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $4.79 million (PSR ¶ 159), and the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment.

The Government anticipates submitting a request for restitution, and requests 60 days under the MVRA to collect the information from impacted victims and make that submission.

## II. The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

### III. The Court Should Impose a Significant Incarceratory Sentence

A sentence of 80 months' imprisonment—with 56 months for the defendant's commission of the fraud and two mandatory years for his aggravated identity theft—would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A. A Significant Sentence is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

A significant incarceratory sentence of 80 months' imprisonment is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant's fraud was brazen in its deception and long-running in its scope. He and his co-conspirators forged letters from sports organizations, large and small, established and new, that all touted their—non-existent—commitment to bringing all their events and customers to the mecca in the Mesa desert: a mega sports park in the West to rival Disney's Wide World of Sports in the East. By stealing the names and reputations of these organizations and their principals, the defendant was able to hoodwink investors into giving Legacy Sports a quarter of a *billion* dollars to build a massive sports complex. And, when the mirage of expected revenue he created failed to appear, the project failed, leaving investors holding the bag and recovering just pennies on the dollar.

This was a scheme that took years to come to fruition. It took dedication to the fraud—working with several co-conspirators to do the dirty work of creating the forgeries. It took planning and commitment to deceive not only investors, but the investment bank, the consultants, the potential customers, and the countless others involved in getting a project like this off the ground. At times, the defendant's sentencing submission appears to try to downplay the defendant's role in the scheme by suggesting that he was simply out of his depth as a CEO and was relying on others with more experience. However, the fraudulent scheme here was not a complicated one; prior experience as a CEO was not required to understand that it is unlawful to forge and fabricate documents that will be shown to investors. And the defendant was not relying on more experienced people, he was creating fraudulent documents himself and directing others, including more-experienced executives at the company, to fabricate the documents.

It was a scheme that harmed a wide range of innocent victims. While the bond investors are major institutional investors like PIMCO, Vanguard, and others whose existence was not jeopardized by this failure, these entities invested the monies of pension funds, retirement accounts, and so on—ordinary investors. The investment professionals at these firms count on the accuracy and truthfulness of the investment opportunities they are making for their clients, particularly in highly regulated investments like municipal bonds. The defendant's fraud also had collateral consequences on others, like vendors who provided goods and services to Legacy Park and are still owed money that they have not recovered in the bankruptcy.

And it was a scheme that directly lined the pockets of the defendant and his family members, to the tune of millions of dollars.

The defendant raises several arguments in support of his request for a below-Guidelines sentence of two years' imprisonment. He first argues that the offering documents made clear that the financial projections were not guarantees of revenue, and the sophisticated investors in municipal bonds were "fully aware that LOIs are unenforceable expressions of interest rather than binding contracts." (Def. Ltr. at 20).

Of course, all projections are subject to change, and the Government is not alleging that the defendants tricked investors into thinking these were legally enforceable contracts. The fraud, however, was that the defendant's representation that these letters and pre-contracts were *authentic*, such that the financial projections had a basis in reality, not mere speculation and certainly not fraud. Notwithstanding the risk disclosures, the bond offering materials repeatedly touted the pre-contracts as "binding" commitments from the organizations "indicating their commitment to use" Legacy Park. (PSR ¶ 22). It also claimed that letters of intent were signed by organizations that had "confirmed their commitment to use Legacy Sports Park" and would sign the pre-contracts after construction groundbreaking. And the letters of intent and pre-contracts were falsely represented as "binding" for the purpose of misleading investors about the firmness of the customer commitments, *i.e.*, these were real customers who were raring to use Legacy Park, not that Legacy would sue them if they breached the letters. During the investor presentation, for example, Chad Miller repeatedly touted these "binding" letters of intent and precontracts as supporting Legacy's expectation that the Park would be "100%" fully utilized from opening. The fraud, in short, was these "binding" commitments were authored by the defendants, not the unsuspecting organizations who were victims of the defendants' identity theft.

The defendant further argues that the Guidelines range is driven almost entirely by the loss amount and overstates his culpability because the Legacy Sports project failed for reasons unrelated to his fraud. (Def. Ltr. at 2, 18-20). Whether Legacy Sports Park failed solely because of the defendants' fraud or for multiple reasons is immaterial, both as a matter of law and in assessing the defendant's culpability. The defendant misled investors about the amount and level of financial commitment that the Legacy Sports project had obtained from sports leagues. As a result, investors were presented with highly misleading revenue projections, which made the project appear financially viable and led to a successful bond offering. Had the defendants not lied to investors and submitted forged documents, the project would not have gotten off the ground. There is also no real dispute that the defendant's fraudulent conduct induced investors to buy bonds they otherwise would not have purchased. There is no need for the Court to disentangle the effect of the defendant's fraud from alleged post-offering contractual failures or unexpected complications created by other parties or events to determine the cause of bankruptcy losses, since the relevant loss amount can be calculated based on the amount fraudulently induced.

Moreover, even assuming for the purpose of argument that the Guidelines loss amount of $284 million overstates the defendant's culpability, any overstatement has already been incorporated into the parties' Plea Agreement, which caps the maximum available sentence here well below the Guidelines that would apply for a $284 million loss amount. At offense level 35, the level corresponding to a loss amount of $284 million, the Guidelines range for the defendant's

conviction would have been 168 to 210 months' imprisonment, plus an additional 24 months' consecutive on Count Three. (PSR ¶ 149) – meaning a combined Guidelines range of 192 months to 234 months' imprisonment. Because, however, the statutory maximum on Count One, the securities offering fraud count that the defendant pleaded guilty to, is only 60 months' imprisonment, the defendant received a 108 to 150-month discount off a purely loss-amount driven Guidelines range. In effect, the Guidelines sentence of 60 months on Count One is the same as if the loss amount calculation were 10 levels lower, *i.e.*, between $3.5 million and $9.5 million, which is the range Chad Miller would have fallen in based solely on the $4 million he personally obtained from the scheme. In short, if anything, the loss amount that effectively applies given the statutory cap far understates rather than overstates the defendant's culpability in this scheme and the massive harm he caused investors. Moreover, as discussed below, the fact that the statutory cap in this agreed-upon resolution has already reduced the otherwise applicable Guidelines range by 108 to 150 months' imprisonment is itself the response to the defendant's request for a reduced sentence of imprisonment based on other factors, such as his relative culpability.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. Justice requires that Miller be punished with a significant incarceratory sentence. A nearly five-year sentence for his securities offering fraud, plus two years for his involvement in identity theft, is necessary to reflect the seriousness of the defendant's conduct.

### B. Deterrence Warrants a Significant Incarceratory Sentence

Both general and specific deterrence support the imposition of a significant incarceratory sentence.

The Court's sentence must specifically deter Chad Miller from committing additional criminal activity. Miller directly and repeatedly engaged in this flagrant securities fraud scheme. This was a scheme that ultimately resulted in the failed Legacy Park bonds, but, as outlined above, dated back years. It extended beyond the municipal bonds themselves, to include the deception to the third-party investor in Legacy Sports that Miller used to repay the money he took from the bond offering. The scope and extent of the defendant's criminal conduct itself requires a significant sentence of imprisonment to further deter the defendant from engaging in illegal conduct that targets and harms innocent investors.

General deterrence is also important here. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 601 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense where defendant made approximately $11.5 million). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based

crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

### C. A Significant Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability and the defendant's personal characteristics also warrant a Guidelines sentence.

"In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Chad Miller was a leader of the scheme. He was the CEO of Legacy Sports and directed others in the fraudulent conduct. He played a critical role in the scheme to create and prepare fraudulent documents that were designed to mislead investors into believing that the Legacy Park had obtained binding commitments from dozens of major sports organizations and would thus be able to make its bond payments. Not only did Chad Miller personally fabricate documents and fraudulently copy signatures, he also directed others to do so, and oversaw the overall process. In that respect, he played a greater role than his father in repeatedly directing and overseeing the fraudulent creation of materials. He also benefited from the fraudulent scheme, receiving more than $440,000 a year in salary along with a six-figure luxury car.[5]

While the PSR suggests that Chad Miller should receive a significantly lesser sentence than his father, who was the leader of the project and benefited the most financially and professionally, that conclusion does not take into account the respects in which Chad Miller was more culpable than, or at least on equal footing with, his father. Chad Miller was a top-level executive of Legacy Sports and made several public statements to investors and others that he knew were false or misleading. Chad Miller was also more directly involved in the fabrication of letters of intent and pre-contracts, either editing them himself or directing others to do so. As is the case with many conspiracies, the participants play different roles, but both defendants here exercised leadership and discretion, and had aggravating roles in the conspiracy. The Government is recommending a sentence slightly below its recommendation of 84 months for Randy Miller in light of Chad Miller's lack of prior federal convictions and a lesser need for specific deterrence. (*See* Gov't Sent. Ltr. R. Miller at 10).

Relative culpability should also reflect that this defendant should be treated like others in this District who have engaged in investment fraud schemes, involving similar amounts of losses, and were sentenced to significant incarceratory sentences. *See, e.g.*, *United States v. Galanis*, No. 15 Cr. 643 (PKC) (defendant sentenced to 10 years in prison for defrauding investors in connection with tribal bond issuance, resulting in $60 million in worthless bonds); *United States v. Alexandre*,

---

[5] It is notable that Chad Miller's employment following Legacy Sports appears to be for a company for which he was receiving a salary of $109,000.

No. 22 Cr. 326 (JPC) (defendant sentenced to 9 years in prison for defrauding investors in his cryptocurrency trading platform into investing $248 million, and misappropriating approximately $14 million); *United States v. Del Valle*, No. 14 Cr. 342 (RMB) (defendant sentenced to 98 months for defrauding investors out of millions of dollars in connection with real estate development project, misappropriating funds, and committing identity theft); *United States v. Meli*, No. 17 Cr. 127 (KMW) (defendant sentenced to 78 months in connection with Broadway ticket resale investment scheme defrauding investors of approximately $100 million, where defendant used portion of money on personal expenses). Notably, even when compared to these other prosecutions, the defendant's scheme involved more investor losses and involved identity theft—factors that make his offense comparatively more egregious than each of these cases, and other similar cases, in the District.

The defendant asks the Court to sentence him to two years' imprisonment based on several factors, including his "prompt" acceptance of responsibility in connection with a plea agreement and information, and his agreement to pay forfeiture. (Def. Ltr. at 1).[6] But since the defendant is facing two years of mandatory, consecutive imprisonment for his aggravated identity theft, such a sentence would effectively mean a sentence of no imprisonment for the defendant's serious securities fraud. Such a sentence would undermine the seriousness of the offense and deterrence. Additionally, while it is true that the defendant promptly entered a guilty plea after charging, the agreed-upon resolution in this case took place only after months of pre-charge negotiations, which themselves began months after an already overt investigation that included the execution of a search warrant at the defendant's home. In addition, while the defendant claims his acceptance of responsibility, his sentencing memorandum also repeatedly seeks to point the finger and deflect blame for his own conduct to other people, entities and events.

In addition, while the defendant has consented to an order of forfeiture, the Government is unaware of the defendant having made any effort to date to pay any amount of restitution or forfeiture to date.

The defendant argues for a sentence of two years' imprisonment based in part on the fact that he committed the crime due to a complicated relationship with his father, whom he was trying to please. The Government recognizes that the familial dynamic may well have contributed to the defendant's decision to involve himself in the criminal activity, much as interpersonal dynamics often play a role in any defendant joining a conspiracy. However, the defendant stands before this Court as a forty-year-old man, who was more than capable of making his own independent decisions about right and wrong, particularly with the type of conduct involved here, involving blatant forgeries that the defendant himself directed.

The defendant also argues that his role as primary caregiver for his children support a sentence of two years' imprisonment. The PSR reflects that the defendant has joint and shared custody of his children with his ex-wife and no reason is identified why his ex-wife would be unable to care for the children during his time in custody. (PSR ¶¶ 107-108). As is most often the

---

[6] While Chad Miller makes a passing reference to "cooperating" with the Government, Miller has not proffered or otherwise cooperated with the Government in the technical sense that that word is used in this District.

case, many other people, including children, are impacted when individuals like the defendant choose to commit crimes and are required to face the consequence of those decisions, It is of course unfortunate that the defendant chose to involve himself in this fraudulent scheme, knowing that the result could lead to imprisonment and time away from his family, including his children. However, the Government respectfully submits that the fact that the defendant is a father to two children is not a sufficient basis to justify a sentence so vastly below the Guidelines.

Balancing all of the relevant Section 3553(a) factors together, including the offense conduct, the defendant's role, his personal characteristics, and the need to promote respect for the law, provide adequate deterrence, and provide just punishment, the Government respectfully submits that a sentence of 80 months' imprisonment would be just.

## V. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of 80 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____/s/_____
Courtney L. Heavey/Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-2413/-1046